ELECTRONICALLY FILED
2014 Feb 28 PM 2:50
CLERK OF COURT - CHANCERY

## TO THE CHANCELLORS OF THE CHANCERY COURT
## FOR THE THIRTIETH JUDICIAL DISTRICT

**MEMPHIS HOUSING AUTHORITY,**

     **Plaintiff,**

vs.

**ZURICH AMERICAN INSURANCE
GROUP, INC. AND AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY, INC.,**

     **Defendants.**

Docket No._____
**Jury Demanded**

### COMPLAINT

       COMES NOW Plaintiff, Memphis Housing Authority ("MHA"), and sues Defendants Zurich American Insurance Group, Inc. ("Zurich") and American Guarantee and Liability Insurance Company, Inc. ("AGLIC") for money damages.

       This is an action at law to redress the harm caused to MHA by Defendants' breach of the terms and conditions of the contract, an "insured contract" insurance policy, and Defendants' continued bad faith in refusing to defend and pay claims under such insurance policy and contract without justification or cause. Plaintiff's causes of action, as set forth in this Complaint, arise under the common law and bad faith refusal to provide a defense and/or indemnity. All of the wrongs complained of against these Defendants occurred in Shelby County, Tennessee, within one year of discovery of Plaintiff's cause of action.

### PARTIES AND JURISDICTION

       1.    Plaintiff, Memphis Housing Authority ("MHA") is a Tennessee public housing authority with its principal place of business located at 700 Adams, Memphis, Tennessee 38105.

       2.    Upon information and belief, Defendant Zurich American Insurance Company, Inc. ("Zurich") is a Illinois insurance company doing business in the State of Tennessee with a



principal place of business believed to be 1400 American Lane, Schaumburg, Illinois 60196. Zurich can be served with process through the Commission of Insurance, 500 James Robertson Parkway, Nashville, Tennessee 37243. Zurich is subject to jurisdiction of this Court pursuant to Tenn. Code Ann. § 20-2-223. Zurich can be served through the Tennessee Commissioner of Insurance. Zurich provided coverage under the insurance policy at issue herein.

3.      Upon information and belief, Defendant, American Guarantee and Liability Insurance Company, Inc. ("AGLIC"), is a New York insurance company doing business in the State of Tennessee with a principal place of business believed to be One Liberty Plaza, 165 Broadway, 32nd Floor, New York, New York 1006. AGLIC can be served with process through the Commission of Insurance, 500 James Robertson Parkway, Nashville, Tennessee 37243. AGLIC is subject to jurisdiction of this Court pursuant to Tenn. Code Ann. § 20-2-223. AGLIC can be served through the Tennessee Commissioner of Insurance. AGLIC provided coverage under the insurance policy at issue herein.

4.      Upon information and belief, AGLIC is a fully owned subsidiary of Zurich and those entities will be referred collectively as "Zurich" herein.

5.      Defendants herein owe a direct duty to defend and indemnify MHA based on Tennessee law that recognizes the duty of an insurer to defend and indemnify a party for which the insured has become contractually obligated to defend and indemnify.

### FACTS

6.      On or about November 1, 2001, MHA and Scruggs Security and Patrol, LLC ("Scruggs") entered into a contract ("the contract" attached hereto as Exhibit 1), wherein Scruggs agreed to provide security services for MHA's premises at 741 Adams Avenue, Memphis, Tennessee.

7.      The contractual agreement between MHA and Scruggs contains an "insured contract" provision that requires Scruggs to name MHA as an additional insured on its insurance policy, maintained by Scruggs and provided by Zurich. The contract between MHA

and Scruggs states as follows:

    8.2.2   Comprehensive General Liability Insurance, with limits of not less than $1,000,000 for bodily injury and/or death arising out of any one occurrence and $1,000,000 general aggregate. The limits of liability for property damage shall not be less than $1,000,000 for each occurrence and $1,000,000 in the aggregate. **The MHA shall be named as additional insured on the insurance policy.**

    8.2.3   Personal Injury Liability Endorsement including libel, slander, etc., with a limit of liability of $1,000,000, including removal of any exclusions pertaining to contractual liability and claims by the Service Provider's employees. **The MHA shall be named as additional insured on the insurance policy,** Tort Endorsement: The Insurer agrees that it shall not use, either in the adjustment of claims or in the defense of suits against the insured, the immunity of the insured from tort liability unless requested by the insured to interpose such defense.

    8.    The "insured contract" also requires that Scruggs indemnify and defend MHA in

the above-referenced claim. The contract states:

    8.9   The Service Provider shall **defend, indemnify and hold MHA harmless** from and against any and all losses, costs (including litigation costs and attorneys' fees), claims, suits, actions, damages, liabilities, and expenses ("Losses"), including, but not limited to, those in connection with loss of life, bodily and personal injury or damage to property, that are caused wholly **or in part by** (1) the service provider's breach of contract, whether the breach arises from its own actions or omissions, or that of the service provider's agents, including sub-consultants or employees, or **(2) the service provider's negligent acts or omissions in connection with its performance of the contract. This indemnity is intended, inter alia, to afford MHA an indemnity against damages caused partly by the negligence of MHA, but shall not extend to damages caused solely by MHA's own negligence.**

    9.    Scruggs maintained an insurance policy provided by Zurich and/or AGLIC which

was in effect from July 16, 2001 to July 16, 2002. *See* policy between Zurich and/or AGLIC and

Scruggs, attached as Exhibit 2. The policy between Zurich and/or AGLIC and Scruggs states:

    9.a.   "Insured contract" means:

        (7) Subject to Sebsection 9.b.(4), that part of any other contract or agreement pertaining to an insured's business under which an insured assumes the tort liability of another to pay damages because of "bodily injury," "property damage" or "personal injury" to a person or organization, if the contract or agreement was made prior to the "bodily injury," "property damage" or "personal injury." Tort liability means a

liability that would be imposed by law in the absence of any contract or agreement.

10.      On February 18, 2003, Cheryl Brown Giggers, Charles G. Brown, Jr., Angela G. Brown and Joann Fisher, individually and as the surviving children of Charles Cornelius Brown, Sr. ("Plaintiffs Brown") filed suit against MHA in connection with a shooting involving an argument or disagreement between an agent of Scruggs and a tenant named, L.C. Miller.

11.      Plaintiffs Brown, among other things, allege that the Scruggs Security guard on duty was negligent in performing his duties. Plaintiffs Brown allege that the Scruggs guard, among other negligent acts, escalated the incident and failed to prevent the harm from taking place. When the shooter (Miller) confronted the Scruggs armed guard, who he had a verbal altercation with moments before, the Scruggs guard ran and hid in a closet in the Residential Leasing Office, which was occupied by multiple innocent bystanders, including the decedent, Brown. In an attempt to shoot the Scruggs guard, with whom Mr. Miller had been arguing and was hiding in the Residential Leasing Office, the shooter shot and killed decedent Brown. *See* Recorded Statement of Darren Stewart, March 22, 2002, pg. 12-13, attached as Exhibit 3; Deposition of Darren Stewart, April 18, 2006, pg. 37, ln. 11, attached as Exhibit 4.

12.      On the date in question, the contract between MHA and Scruggs quoted herein, and the contract between Scruggs and Zurich, were in full force and effect.

13.      MHA first tendered the defense of this case to Zurich on April 2, 2002, only days after the incident which led to Mr. Brown's death. Zurich did not respond to this request. MHA has repeatedly tendered defense of this matter to Zurich and has repeatedly demanded indemnification from Zurich. Zurich, however, declined to defend MHA and did not respond to these tenders. *See* correspondence attached as Exhibit 5.

14.      Zurich failed to live up to its obligation under the policy and the contract between Zurich and Scruggs (the "insured contract") despite numerous requests for same by MHA. Zurich did not provide defense or indemnification to MHA.

15.     MHA requested on multiple occasions for Zurich to provide a copy of the insurance policy between Zurich and Scruggs that was in effect at the time of the underlying incident in order to determine if coverage existed.

16.     On July 9, 2009, in response to multiple requests over a seven (7) year period to produce a copy of the insurance policy, Zurich provided a one-page declaration page which was intended to falsely imply that no coverage existed for MHA. *See* attached Exhibit 6.

17.     On December 20, 2012, after further requests by MHA, Zurich produced yet another incomplete copy of the insurance policy which, again, was intended to falsely imply that no coverage existed for MHA. *See* attached Exhibit 7.

18.     Upon further MHA requests, on March 1, 2013, Zurich produced more policy documents which revealed that coverage, in fact, did exist for MHA based on an "insured contract provision." *See* email attached as Exhibit 8 which states as follows: "Sorry Wes. The company sent the attached after I sent you the first set of policy documents and they never got sent to you. Let me know what questions remain after reviewing this. I believe the dec page and *forms list were part of the original set of documents. Let me know if I am mistaken."*

19.     Zurich breached its fiduciary duty and acted in bad faith by not providing a defense and indemnification to MHA as required by the agreement and insurance policy. Further, Zurich attempted to deliberately conceal the existence of coverage by supplying only partial copies of the policy at issue, which falsely implied that coverage did not exist.

20.     As a result of the wrongful actions by Defendants described herein, MHA has been harmed and has suffered damages including incurred attorneys' fees and adjusting fees. *See* attached Exhibit 9.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

21.     Paragraphs 1 through 20 are incorporated herein by reference.

22.     The terms of policy between Zurich and Scruggs require Zurich to defend any suit and pay any damages that Scruggs becomes legally obligated to pay through an "insured contract."

23.     The policy between Zurich and Scruggs requires Zurich to "pay those sums that the insured (Scruggs) becomes legally obligated to pay as 'damages' because of 'bodily injury' or 'property damage' caused by on occurrence that takes place during the policy period in the 'coverage territory,' or caused by errors or omissions related to 'security guard operations' that take place during the policy period in the 'coverage territory.' The policy further states that Zurich has the "right and duty to defend any 'suit' seeking those damages. This policy clearly provides coverage for all "insured contracts" which Scruggs entered.

24.     Zurich breached the terms of its policy with Scruggs by failing to defend and/or indemnify MHA, with whom Scruggs had an "insured contract."

25.     The policy between Zurich and Scruggs defines an "insured contract" as a "contract or agreement pertaining to the insured's business under which an insured assumes the tort liability of another to pay damages because of 'bodily injury,' 'property damage' or 'personal injury' to a person or organization, if the contract or agreement was made prior to the the of 'bodily injury,' 'property damage' or 'personal injury.'"

26.     MHA, as a third-party beneficiary to the policy between Zurich and Scruggs, has suffered damages as a result of Zurich's failure and refusal to defend and indemnify MHA.

27.     Tennessee law allows MHA to proceed with a claim for damages suffered as a result of Zurich's refusal to defend and/or indemnify MHA in this matter. *York v. Vulcan Materials Co.*, 63 S.W.3d 384, 387 (Tenn. Ct. App. 2001); *see also "Agreements to Indemnify & General Liability Insurance: A Fifty State Survey,"* Weinberg Wheeler.

<u>COUNT II</u>
<u>BAD FAITH REFUSAL TO DEFEND AND INDEMNIFY</u>

28.     Paragraphs 1 through 27 are incorporated herein by reference.

29.     Zurich, by its conduct, acted in bad faith by refusing to provide a defense and/or indemnification to MHA, and is liable to MHA for such damages described herein, including damages for attorneys' fees, expenses incurred in defense of this case, and any amount MHA pays in settlement of the underlying claim.

30.     MHA was an additional insured under the terms of the contract between Scruggs and MHA. As such, Zurich had a contractual duty to defend claims against MHA.

31.     Zurich failed to discharge its duty to act in good faith because it did not exercise ordinary care and diligence in investigating the claim and the extent of damage for which the insured may be held liable.

32.     Tennessee law states that to deny a valid insurance claim without a factual basis and to subsequently misrepresent the reasons for the denial is bad faith. Zurich acted in bad faith by attempting to conceal the fact that coverage existed and that it was under a contractual duty to defend MHA. MHA tendered defense of the underlying claim to Zurich shortly after the incident giving rise to same occurred. Zurich ignored MHA's many tenders for seven (7) years before finally responding with a series of communications intended to falsely imply no coverage existed.

### PUNITIVE DAMAGES

33.     Paragraphs 1 through 32 are incorporated herein by reference.

34.     Zurich's actions in attempting to conceal the fact that coverage existed under the policy between Zurich and Scruggs represents fraud and concealment making punitive damages proper in this case.

35.     Plaintiff's claim for punitive damages is not based on Zurich's bad faith refusal to pay on the policy between Zurich and Scruggs. Rather, the claim for punitive damages is based on Zurich's active and repeated fraudulent attempts to conceal from MHA the fact that coverage existed. See Medley v. A.W. Chesterton Co., 912 S.W.2d 748, 752-53 (Tenn. Ct. App. 1995).

WHEREFORE, Plaintiff prays that after due proceedings, judgment be entered in its

favor against Zurich, as follows:

1.   That there be judgment that coverage exists within the terms and conditions contained in the insurance policy at issue, and that Zurich breached the terms of the Policy and the contract by refusal to provide a defense and/or indemnification to MHA;

2.   That Defendants be ordered to pay directly to MHA all benefits due under the terms and conditions of the insurance policy and the contract together with pre-judgment interest and post-judgment interest, as permitted by applicable law;

3.   That Defendants be ordered to pay the bad faith penalties set forth in T.C.A. §56-7-106.

4.   That Defendants be ordered to pay punitive damages in the amount to be set by a jury.

5.   That Plaintiff be awarded reasonable attorneys' fees, costs and all other relief both general and specific, to which Plaintiff may be entitled; and

6.   That a jury be empanelled to try the issues when joined.

Respectfully submitted,

BY:

C. WESLEY FOWLER (#18652)
JONATHAN RICHARDSON (#32338)
The Fowler Law Firm, PLLC
25 Dr. M L King Jr. Avenue
Memphis, Tennessee 38103
Office: (901) 322-8018
Fax: (800) 322-3161
E-mail: wfowler@wesfowlerlaw.com
*Counsel for Memphis Housing Authority*

CH·14·0313

# Exhibit 1

07/08/2009 11:04 FAX   9017480092      TENCOSERVICESINC           ☒003/028

## MEMPHIS HOUSING AUTHORITY
## AGREEMENT FOR SECURITY SERVICES

### AT

### BORDA TOWERS
### VENSON CENTER
### JEFFERSON SQUARE
### BARRY HOMES

### CONTRACT NO: PS 02-C-0023

This Agreement, effective on November 1, 2001 and entered into between the MEMPHIS HOUSING AUTHORITY (hereinafter referred to as "MHA") and Scruggs Security and Patrol, LLC (hereinafter referred to as "Service Provider"), is for provision of security services at MHA highrises for the elderly and handicapped, as provided herein.

#### THE MHA AND THE SERVICE PROVIDER AGREE AS FOLLOWS:

WHEREAS, the MHA is engaged in the development and operation of safe, decent and sanitary housing throughout the City of Memphis, Tennessee for low-income families in accordance with the United States Housing Act of 1937, 42 U.S.C. §1437 et seq.; regulations promulgated by the United States Department of Housing and Urban Development ("HUD"), and other applicable laws, rules, regulations and ordinances;

WHEREAS, the MHA issued an Invitation for Bid (IFB) on September 10, 2001 and in response to which the Service Provider submitted a bid ("Bid") dated October 4, 2001.

WHEREAS, the MHA desires to enter into this Agreement to secure the professional services of the Service Provider and the Service Provider states that it is ready, willing and able to provide the Services.

NOW THEREFORE, in consideration of the mutual promises and the terms and conditions set forth herein, the MHA and the Service Provider do hereby agree as follows:

. 07/08/2009 11:05 FAX  9017480092          TENCOSERVICESINC                         ☒ 004/028

## ARTICLE 1
### GENERAL PROVISIONS

1.1 **Relationship of Trust and Confidence/Standard of Care.** The Service Provider accepts a relationship of trust and confidence with the MHA, and specifically acknowledges that MHA has engaged the Service Provider, in lieu of staff directly employed by MHA, for security services, subject to consultation with and approval by the Executive Director, and to advise MHA with respect to its rights, duties, obligations, interests and options as owner of the various highrises managed by the Authority.  The Service Provider shall render its services under the Contract acting solely in MHA's best interests, in good faith, and with the degree of professional care, skill and diligence normally exercised by professional Service Providers in similar circumstances.

1.2 **Service Provider Not An Agent.** The Service Provider acknowledges that it is not an agent of MHA and has no authority to bind MHA in any way, unless authorization to act on MHA's behalf in carrying out specific tasks is hereafter specifically given to the Service Provider in writing, signed by the Executive Director. MHA hereby designates the Executive Director as its sole Authorized Representative for making any changes to this Contract, and for approving actions or commitments by MHA that may be recommended or suggested by the Service Provider in the course of its duties. MHA may add to or modify its designation of Authorized Representatives by written notice, signed by the Contracting Officer, and delivered to the Service Provider.  MHA shall not designate additional Authorized Representatives, or change its designation, in any other way.

1.3 **Service Provider's Personnel and Sub-consultants.** The Service Provider shall assign experienced and properly qualified personnel to the performance of all duties respective to this Contract, to the extent necessary to ensure that all of its obligations under the Contract are carried out with the degree of professional diligence, care and skill set forth in this Agreement.  If MHA requests that any person rendering services pursuant to the Contract be replaced, the Service Provider shall immediately comply with the request, and provide a suitably qualified substitute within five (5) business days of the request for replacement.

1.4 **Subcontracting and Delegation of Duties.** The Service Provider may not subcontract or otherwise delegate its duties under the Contract without the prior written consent of MHA.  If the Service Provider were authorized to subcontract any of its duties, the Service Provider must enter into a written subcontract with each subcontractor. Each subcontract must include the following provisions:

    (a) to the extent of the work within the subcontract scope, the subcontractor is bound to the Service Provider for the performance of all obligations which the Service Provider owes MHA under the Contract;

2

(b)     the subcontractor is not in privity with MHA and shall not seek compensation directly from MHA under a theory of third-party beneficiary, quantum meruit, or unjust enrichment claim, or otherwise;

(c)     MHA is a third-party beneficiary of the subcontract, entitled to enforce any rights thereunder for its benefit;

(d)     the subcontractor consents to assignment of its subcontract to MHA, at MHA's sole option, if the Service Provider is terminated for default, without increase in the subcontract price;

(e)     the subcontractor shall maintain records of all its work pursuant to the subcontract, and the costs associated with that work, and make those records available to MHA, HUD, the Comptroller General of the United States, and their designated representatives, for review and audit at any time during the term of the subcontract and for a period of three years from the completion or other termination of the subcontract;

(f)     the subcontractor shall obtain and maintain, for the term of the subcontract, workers' compensation insurance in accordance with the requirements of the State of Tennessee;

(g)     if MHA terminates the Contract for convenience, the Service Provider may similarly terminate the subcontract for convenience, and the subcontractor shall in such a case, be entitled only to the relief described in the Termination for Convenience provisions of the Service Provider's Contract;

(h)     MHA shall have the right to enter into a contract with the subcontractor for the same price as its subcontract price less amounts already paid, if the Service Provider files a voluntary petition in bankruptcy or has an involuntary petition in bankruptcy filed against it; and,

(i)     a provision requiring that the subcontractor promptly pay subcontractors and suppliers at lower tiers and barring reimbursement for interest paid to lower-tier subcontractors or suppliers due to a subcontractor's or supplier's failure to pay them in timely fashion.

1.5     **Licenses and Certifications.** The Service Provider shall possess, and at all times during the Contract term maintain, any licenses and/or certifications required by

3

07/09/2009 11:05 FAX  9017480092          TENCOSERVICESINC                    ☒006/028

to have or maintain such licenses and/or certifications shall constitute a material breach of the Service Provider's Contract, and subject to immediate termination of the Agreement by the MHA.

**1.6    Integration and Interpretation of Contract.** The Service Provider's Contract is a complete and integrated expression of the parties' agreement with respect to the subject matter of the Contract, and supersedes all prior or contemporaneous representations or negotiations, whether written or oral. All of the documents comprising the parties' agreement are complementary. They shall be read together, so that what is called for by one is called for by all. To the extent that there is any inconsistency or conflict between or among requirements set forth in the Contract documents, the provisions of this Agreement shall supersede over any inconsistencies or conflicts.

**1.7    Compliance with Laws.** In carrying out all of its duties pursuant to the Contract, the Service Provider shall comply with all Laws, and the guidelines or requirements of all governmental authorities having jurisdiction over the Contract or the Department's Projects, including, without limitation, all HUD requirements.

**1.8    Ownership and Confidentiality of Documents.**

**1.8.1    All** documents or data prepared or furnished by the Service Provider or its sub-consultants in the performance of the Contract shall become the property of MHA upon their preparation, subject only to MHA's obligation to pay the Service Provider amounts properly due to it under the Contract. The Service Provider shall promptly deliver such documents to MHA upon its written request, or promptly after termination of the Contract, and shall have no further rights of ownership of the documents, and no right to further employment or compensation arising from MHA's use of the documents.

**1.8.2    The** Service Provider agrees that the substantive content of all deliverables, reports and documents prepared or assembled by the Service Provider pursuant to the Contract is to remain confidential except to the extent released by MHA or HUD, in writing, and except to the extent that the information must be disclosed to sub-consultants to allow them to carry out work required by this Contract. However, all sub-consultant agreements must include language substantially similar to the confidentiality provisions of this Contract, requiring them to maintain the confidentiality of MHA's confidential information.

4

07/09/2008 11:06 FAX  9017480092          TENCOSERVICESINC                    ☒007/029

## ARTICLE 2
## MHA RESPONSIBILITIES

**2.1**  **Principal Contact Person.** Promptly upon execution of this Contract, the Contracting Officer shall designate a senior member of its staff to serve as the principal point of contact between MHA and the Service Provider. The Service Provider shall direct all communications to MHA through this designated person.

**2.2**  **Communication.** Promptly upon execution of this Contract, the Service Provider and the Contracting Officer shall meet to determine the persons, in addition to the person identified pursuant to Subparagraph 2.1, who should be made available to communicate on a routine basis with the Service Provider, and those who shall be authorized to render decisions or provide approvals that will be required to implement security services actions recommended by the Service Provider, and to render or facilitate such other approvals and decisions as the Service Provider may require to carry out its functions pursuant to this Contract. Promptly after this meeting, the Service Provider shall record in a memorandum the decisions of the meeting and submit it to MHA for approval. Once approved, the memorandum ("Memorandum of Communication and Authority") shall become a part of this Contract. All references in the Contract to communications with or approvals by MHA shall mean communications with or approvals by the MHA representatives designated in the Memorandum of Communication and Authority.

**2.3**  **Office Space and Equipment.** The MHA shall provide the Service Provider, at no cost, adequately furnished and equipped office space, if necessary. If applicable, the office shall have access to a telephone and other business equipment that may be deemed necessary for security services activities.

**2.4**  **Document Reproduction.**  The Service Provider shall also have the use of MHA's copy and fax machines at no cost.

## ARTICLE 3
## SERVICE PROVIDER SERVICES - GENERAL

**3.1**  **Services, Generally.** The scope of work required under the Contract is to provide all , materials, supplies and labor to perform routine security services at MHA's highrises for one (1) year. The essential purpose of the Contract is to outsource security services for MHA highrises, to a provider who shall act for MHA, subject only to consultation and approval by the Department Director, and who shall act in lieu of employees that would otherwise have to be hired by MHA to manage the Department's functions. If there is any inconsistency between the descriptions of the scope of work in the various documents comprising the

5

Department's functions. If there is any inconsistency between the descriptions of the scope of work in the various documents comprising the Contract, the provisions of this Agreement shall supersede any inconsistent provisions of the contract documents or the IFB.

**3.2**    **Meetings.** The Service Provider shall, under the Contract, engage in such meetings or discussions with representatives from MHA, HUD, residents of any MHA project or property, or others as may be necessary to carry out MHA's duties under the Laws, or rules, guidelines and requirements of HUD and/or other funding authorities with respect to the Department's Projects.

**3.3**    **Public Information Activities.** Although not foreseen, the Service Provider shall assist MHA in public information activities including preparation of program information on program activities and attendance at internal and public information meetings as required.

### ARTICLE 4
### TECHNICAL ASSISTANCE

**4.1**    **Generally.** From time to time, the staff of various MHA departments are confronted with issues and may not have the expertise to properly evaluate the conditions and determine an appropriate course of action. The Service Provider shall be responsible for providing this type of technical assistance to the agency staff with regard to security services related issues. He/she shall be prepared to assess the situation, determine an appropriate course of action and make a recommendation to the staff.

### ARTICLE 5
### MBE/EQUAL OPPORTUNITY REQUIREMENTS

**5.1**    **MBE/WBE Participation.** If the Service Provider is not a fifty-one percent (51%) minority- or woman-owned firm, it shall be required to participate in MHA's MBE/WBE Program. MHA encourages joint ventures between minority and non-minority firms.

**5.2**    **Section 3 Requirements.** The work to be performed under the Contract is subject to the requirements of Section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. §1701u ("Section 3"). The purpose of Section 3 is to ensure that employment and other economic opportunities generated by HUD assistance or HUD-assisted projects covered by Section 3, shall, to the greatest extent feasible, be directed to low- and very low-income persons, particularly persons who are recipients of HUD assistance for housing. The parties to the Contract agree to comply with HUD's regulation 24 CFR part 135, which implements Section 3. As evidenced by their execution of the

6

07/08/2009 11:07 FAX   9017480082       TENCOSERVICESINC          ⌀008/029

Contract, the parties to the Contract certify that they are under no contractual or other impediment that would prevent them from complying with the part 135 regulations.

5.2.1     The Service Provider shall certify that any vacant employment positions, including training positions, that are filled after the Service Provider is selected but before the Service Provider's Contract is executed, with persons other than those to whom the regulations of 24 CFR Part 135 require employment opportunities to be directed, and were not filled to circumvent the contractor's obligations under 24 CFR part 135. Non-compliance with 24 CFR part 135 may result in sanctions, termination of the Contract for default, and debarment or suspension from future HUD-assisted contracts.

5.2.2     To the greatest extent feasible, the Service Provider shall encourage all contractors, sub-contractors and other contract awardees to utilize public housing residents first and then other lower income neighbors to fill new hiring needs for trainees and employees whenever the opportunity to do so arises during the execution of the Department's Projects. Only after a good faith effort is made to fill these positions (and other positions which may become available) shall the pertinent party, i.e., the Service Provider, contractor, subcontractor or other contract awardees, fill these positions with people outside the resident population. A minimum goal of twenty percent (20%) of new hires of the labor component of each contractor and sub-contractor's work force shall be constituted by the residents of the public housing development being treated or exterminated. The MHA may reduce this goal if provided with acceptable evidence that the minimum goal for public housing development residents is not feasible.

5.2.3     Additionally, the Service Provider and its contractors and subcontractors shall, to the greatest extent feasible, subcontract with businesses owned by the MHA residents or businesses whose work force is comprised of thirty-five percent (35%) or more of the MHA residents.

5.3   **Equal Employment Opportunity.** During the performance of this contract, the Service Provider shall comply with the following provisions:

5.3.1     The Service Provider or his/her sub-consultant or subcontractor, where applicable, will not discriminate against any employee or applicant for employment because of age, race, creed, color, national origin, ancestry, marital status, or sex. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of

7

07/08/2009 11:07 FAX  9017480092        TEHCOSERVICESINC                    ☑ 019/029

including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this nondiscrimination clause.

5.3.2   The Service Provider or his/her sub-consultant or subcontractor, where applicable will, in all solicitations or advertisements for employees placed by or on behalf of the Service Provider, state that all qualified applicants will receive consideration for employment without regard to age, race creed, color, national origin, ancestry, marital status, or sex.

5.3.3   The Service Provider or his/her sub-consultant or subcontractor, where applicable, will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency Contracting Officer, advising the labor union or workers' representative of the Service Provider's commitments under this act and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

## ARTICLE 6
## AMENDMENTS TO SERVICE
## PROVIDER CONTRACT

6.1   **Changes Authorized.** MHA may, without invalidating the Contract, order changes in the work, including, without limitation, deletions from the scope of the Contract work, or modifications to the scope of the Contract work. Any such change must be conveyed by MHA via written amendment.

6.2   **Changes by Written Amendment Only.** All changes must be made by written Amendment, executed by the Director of MHA or his/her designee, and, if required by applicable Laws and procedures, by HUD as well.

6.3   **Additional Services.** The parties intend for this Agreement to cover security services necessary for the well being of residents of the highrises. However, MHA recognizes that unforeseen conditions or extraordinary circumstances outside the control of the Service Provider may require additional services not currently contemplated by the parties. Therefore, to the extent that such circumstances: (a) significantly increase the level of effort necessary to provide security (b) require a change to the scope of the services described in this Agreement to properly carry out the security services, such modifications shall be treated as Additional Services, and the parties shall negotiate an equitable adjustment to modify this Agreement accordingly. No Additional Services may be undertaken except pursuant to an Amendment issued in accordance with this

8

adjustment to modify this Agreement accordingly. No Additional Services may be undertaken except pursuant to an Amendment issued in accordance with this Article. If the Service Provider believes that a specified service is an Additional Service, entitling it to an Amendment, and MHA determines that the service is within the original scope of the Contract work, the Service Provider shall assert a claim, in accordance with the Claims and Disputes Article, and shall proceed with the disputed work without delay, in accordance with MHA's direction.

6.4     **Amendment Procedure.** Any proposed Amendment shall be generated by the Service Provider and presented to the Department Director, or his/her designee for review and approval. The proposed Amendment shall describe clearly and specifically the particular identified needs to be met by the proposed services, and the work to be added to the Service Provider's Contract. The Service Provider shall present, with the proposed Amendment, a written proposal detailing the services to be provided, the schedule for delivery of those services, and the fee associated with those services, which shall be based on the hourly or unit rates set forth in the Service Provider's Proposal. The decision whether or not to issue an Amendment shall be made by the Contracting Officer, after negotiation and cost analysis pursuant to 24 CFR §85.36(f). If the Contracting Officer is satisfied that the proposed Amendment is justified, MHA shall issue a written Amendment modifying the Contract and authorizing the Service Provider to provide the additional services, and stating either an agreed lump sum, a maximum amount, or the hourly rate for those services. The Service Provider shall not proceed with any services prior to: (1) written authorization from MHA and, (2) if required by applicable Laws and procedures, approval by HUD.

6.5     **Entitlement to Modifications in the Scheduled Completion Dates.** Subject to the condition precedent that the Service Provider have complied with the notice and documentation provisions of this Agreement, and subject to any other limitations stated in this Agreement, the Service Provider is entitled to an equitable extension of time to the extent that its work has been delayed because:

6.5.1     The Authority has changed, suspended or delayed the work, by Amendment or other action, or by failure to take a required action within the allowed time; or

6.5.2     The Service Provider's work is delayed for other reasons which are beyond its control and which could not reasonably have been anticipated as of the Contract's effective date.

6.6     **Amendments to the Agreement.** The Service Provider is entitled to an Amendment modifying the Contract Term and the Contract Price if MHA issues any directive that adds to the services required of the Service Provider, extends the schedule for performance of the work, or if MHA, by its actions or omissions, suspends or delays the Service Provider's work for an unreasonable period and the

9

. 07/08/2008 11:08 FAX  9017480092          TENCOSERVICESINC                        ☒012/029

Service Provider demonstrates that the delay has increased its costs of performance. The Contract Term and Contract Price shall not be modified except by a written Amendment to this Agreement executed by both MHA and the Service Provider.

6.6.1  Additional Services performed within the term shall be priced using the hourly rates set forth in the bid, as long as they have been justified by MHA's analysis of appropriateness of scope, staffing allocation and overall cost.

6.7  **Notice/Documentation Requirements.**  The Service Provider must notify MHA of any event, circumstance or action that it believes entitles it to a change in the Contract Price or to an extension of time, within thirty (30) business days after it knew or should have known of the event, circumstance or action. The notice must be in writing, identify the event, circumstance or action, and state, in as much detail as reasonably possible, the amount of the requested adjustment or the length of the requested time extension, together with an explanation of how the amount was calculated, and why an adjustment is justified. Failure to give the required notice or documentation within the allowed time shall constitute a waiver of the right to an Amendment for the claimed charge.

6.8  **Effect of Agreed Amendments.**  If MHA and the Service Provider agree that a change has occurred, and the amount, if any, by which the Contract Price and/or the time to complete the contract should be modified, they shall include the terms of their agreement in an Amendment and both parties shall sign it, after which, it shall be binding upon both. The Service Provider and the MHA agree that any Amendment executed by MHA and the Service Provider constitute its and the MHA's full and final adjustment for all costs, delays, disruptions, inefficiencies, accelerations, schedule impacts, or other consequences arising from the change in question, whether prompted by the change, or from any claimed cumulative effect of changes made to the date of the Amendment, and that no further adjustments in compensation or time shall be sought or made with respect to the change.

6.9  **Failure to Agree.**  If the Service Provider claims entitlement to an Amendment, and MHA responds, in writing, that it does not agree that any action or event has occurred to justify any change in time or compensation, the Service Provider shall nevertheless proceed with its Contract work, without interruption or delay, and shall make a claim as provided in Article 9 of the Agreement. Failure to proceed due to a dispute over a request for Amendment shall constitute a material breach of its Contract and entitle MHA to all available remedies for such breach, including, without limitation, termination for default.

10

07/09/2009 11:08 FAX  9017480092        TENCOSERVICESINC                          013/029

## ARTICLE 7
## COMPENSATION

**7.1 Contract Price.** The Service Provider shall be compensated for the security services rendered pursuant to the Contract at a guaranteed maximum price of one hundred ninety thousand, eight hundred forty-eight dollars ($190,848.00).

**7.2   Modification of Compensation.** The Service Provider's compensation shall not be modified, except by a written Amendment which has been executed by MHA and, if approval is required by HUD, has been approved by HUD. The Service Provider acknowledges that the Contract Price shall constitute the Service Provider's full compensation of all costs, direct and indirect, incurred in carrying out the services contemplated by the Contract, and that no further compensation on account of costs or profit shall be due, other than for Additional Services pursuant to approved Amendments.

**7.3   Invoicing/Timing of Payment.**   The Service Provider shall invoice for payment monthly on a time basis. Invoices shall be based on the actual man-hours worked during the month. Invoices shall be submitted on a date mutually acceptable to the Service Provider and MHA. Invoices shall be accompanied by documentation acceptable to MHA and in accordance with all applicable laws, regulations, requirements and guidelines of applicable governmental authorities. MHA need not make payment with respect to services that are not appropriately documented. Payment for properly invoiced and documented services shall be made within thirty (30) days of MHA's receipt of the invoice.

**7.4   Withholding of Payment.**   MHA may withhold payments from the Service Provider if the Service Provider commits any substantial breach of the Contract and, as of the time of the payment request, has not cured that breach.

## ARTICLE 8
## INSURANCE, LIENS AND INDEMNITIES

**8.1   Required Insurance.** The Service Provider shall obtain and maintain, at its sole cost and expense, insurance of the types and amounts, and for the periods, set forth in this Article. All insurance shall be procured from reputable insurers authorized to do business in the State of Tennessee and reasonably acceptable to MHA.

11

07/09/2009 11:03 FAX  9017480092          TENCOSERVICESINC                    ☒014/025

**8.2    Limits of Insurance.** The Service Provider shall keep in full force and effect for the period beginning from the date of this Agreement and ending at completion of all services to be provided hereunder, insurance policies protecting the MHA against claims for:

  **8.2.1**    Worker's Compensation and Employer's Liability, according to the applicable Tennessee statute, and within the maximum limits of coverage provided therein;

  **8.2.2**    Comprehensive General Liability Insurance, with limits of not less than $1,000,000.00 for bodily injury and/or death arising out of any one occurrence and $1,000,000.00 general aggregate. The limits of liability for property damage shall not be less than $1,000,000.00 for each occurrence and $1,000,000.00 in the aggregate. <u>The MHA shall be named as additional insured on the insurance policy.</u>

  **8.2.3**    Personal Injury Liability Endorsement including libel, slander, etc., with a limit of liability of $1,000,000.00, including removal of any exclusions pertaining to contractual liability and claims by the Service Provider's employees. <u>The MHA shall be named as additional insured on the insurance policy.</u> Tort Endorsement: The Insurer agrees that it shall not use, either in the adjustment of claims or in the defense of suits against the insured, the immunity of the insured from tort liability unless requested by the insured to interpose such defense.

  **8.2.4**    Professional Liability insurance with minimum limits of liability of $1,000,000.00 per claim and in the aggregate written on a "claims made basis". If there is some kind of deductible under any of the Professional Liability Insurance, the Service Provider shall have to submit evidence and guarantee of funds to cover said deductibles.

**8.3    Deductibles.** Any deductible amount, under any of the policies, shall be assumed in whole by the Service Provider for any and all losses, claims, expenses, suits, damages, costs, demands or liabilities, joint and several of whatever kind and nature arising under this Agreement.

  **8.3    Specific Insurance Terms and Conditions.** Where applicable, each insurance policy maintained by the Service Provider must be endorsed as follows:

12

07/09/2009 11:09 FAX  9017480092           TENCOSERVICESINC                    Ø015/029

8.4.1   The MHA and its officers, agents and employees are named as additional insured (except Worker's Compensation, Professional Liability and Automobile Liability) but only with respect to liability arising out of services and/or operations performed for such insured by or on behalf of the name insured.

8.4.2   The insurer shall be required to give the MHA written notice at least thirty (30) days in advance of any cancellation or material change in any such policies.

8.4.3   The Service Provider shall furnish to the MHA prior to commencement of the work, certificates of insurance from insurers with a rating by the A.M. Best Co. of A and 5 or over on all policies, reflecting policies in force, and shall also provide certificates evidencing all renewals of such policies. Insurers shall retain an A.M. Best. rating of A and 5 or over on all policies throughout the term of this Agreement and all policy periods required herein. The insurance company must be authorized to do business in the State of Tennessee and be in good standing.

8.4.4   The required documentation must be received prior to the Service Provider commencing services. No Service Provider or its authorized representatives are to begin their responsibilities under this Agreement prior to full compliance with this requirement and notification from MHA to proceed.

8.5   **Failure to Provide Required Insurance.** If the Service Provider fails to obtain or maintain the required insurance, MHA shall have the right to treat such failure as a breach of contract and to exercise all appropriate rights and remedies, including Termination for Default.

8.6   **Additional Insured.** MHA and its board members, officer, employees and agents shall be named as additional insureds on the general liability policy, and the policy shall be endorsed to reflect that the coverage afforded the additional insured shall be primary to any other coverage available to them.

8.7   **Notification of Cancellation or Material Change.** All policies must be endorsed to reflect that they may not be canceled or materially changed by the insurer, and that the insurer may not refuse to renew the policies, except upon thirty (30) days' written notice, by registered mail, to MHA Compliance Department.

8.8   **Evidence of Insurance Coverage.** Certificates of insurance evidencing the required coverage must reflect all endorsements described. The certificates of insurance must specifically reference the Contract and otherwise conform to MHA's reasonable requirements. The insurance requirements set forth herein, are

13

07/08/2009 11:10 FAX  9017480092          TENCOSERVICESINC          @016/028

not intended and shall not be construed to modify, limit or reduce the indemnifications made in the Contract by the Service Provider to MHA.

**8.8.1**    Before beginning any work on the Project, and upon any reasonable demand thereafter, the Service Provider shall provide MHA with evidence that all required insurance is in force.    Copies of the certificates of insurance must be submitted to MHA before work is begun and at least fifteen (15) days before each renewal date.   Under no circumstances shall the Service Provider actually begin work (or continue work, in the case of renewal) without providing the required evidence of insurance.

**8.8.2**    MHA reserves the right to require the Service Provider to furnish certified copies of the original policies of all insurance required by the Contract at any time, upon five (5) days' prior written notice.  MHA's receipt, without objection, of any certificate that fails to conform with the insurance requirements set forth in the Contract does not constitute MHA's agreement that the insurance requirements have been or may be modified.

**8.9**    **Indemnity.**    The Service Provider shall defend, indemnify, and hold MHA harmless from and against any and all losses, costs (including litigation costs and attorneys' fees), claims, suits, actions, damages, liabilities, and expenses ("Losses"), including, but not limited to, those in connection with loss of life, bodily and personal injury or damage to property, that are caused wholly or in part by (1) the Service Provider's breach of the Contract, whether the breach arises from its own actions or omissions, or that of the Service Provider's agents, including sub-consultants or employees, or (2) the Service Provider's negligent acts or omissions in connection with its performance of the Contract.   This indemnity is intended, inter alia, to afford MHA an indemnity against damages caused partly by the negligence of MHA, but shall not extend to damages caused solely by MHA's own negligence.

**8.9.1**    If a third party asserts any claim against the Service Provider, Service Provider shall promptly notify MHA, in writing.  If Service Provider believes that the claim, whether justified or not, arises solely from the actions or omissions of MHA, rather than from the Service Provider's actions, omissions, or breaches, the Service Provider shall tender its defense of the claim to MHA.  If MHA admits that the claim, whether justified or not, arises solely from its own actions or omissions, it shall accept the tender of defense, and the Service Provider shall thereafter cooperate fully with MHA in its handling of the defense.  Otherwise, the Service Provider shall conduct its own defense.  If it is ultimately determined by a court of competent jurisdiction or in binding arbitration, or is agreed between MHA and the Service Provider, that

14

the Losses associated with a claim arose solely from MHA's actions or omissions, MHA shall indemnify the Service Provider for all resulting Losses, including, without limitation, all reasonable attorneys' fees incurred in defending the claim.

## ARTICLE 9
## TERM OF CONTRACT/TERMINATION

9.1     **Term of Contract.** The Service Provider's Contract shall extend for one (1) year from the Effective Date, or until the Contract is terminated in accordance with its terms, whichever first occurs, subject to extensions of time granted in accordance with Article 6 of this Agreement.

9.2     **Termination for Default.** MHA may terminate the Contract for default if the Service Provider fails materially to perform any of its duties or obligations under the Contract.

    9.2.1     In particular, but without limitation, MHA may terminate the Contract if:

        (a)     The Service Provider fails to prosecute the work diligently and in accordance with the requirements of the Contract; or

        (b)     Becomes insolvent, makes an assignment for the benefit of creditors, files a voluntary petition under any chapter of the Bankruptcy Code or has an involuntary petition filed against it under any chapter of the Bankruptcy Code, or has a receiver appointed, or files for dissolution or otherwise is dissolved; or

        (c)     The Service Provider fails to pay its debts in a timely manner or becomes insolvent, or MHA reasonably determines that the Service Provider does not have the financial ability to carry out its obligations under the Contract and the Service Provider fails to give MHA prompt and reasonable assurances of its ability to perform; or

        (d)     The Service Provider violates any applicable laws or policies, procedures, or guidelines of MHA and/or HUD applicable to the Contract.

    9.2.2     MHA must provide the Service Provider with written notice of its intent to terminate the Contract for default ten (10) business days before actually putting the termination into effect. If the Service Provider has begun its curative action and has made progress satisfactory to MHA within the ten business days, MHA may so notify

15

07/08/2008 11:11 FAX 9017480092          TENCOSERVICESINC                    ☑019/028

the Service Provider and the termination shall not take effect.
Otherwise, the termination shall take effect after ten (10) business days
without further notice or opportunity to cure.

9.2.3    If MHA terminates the Contract for default, it shall have the right, but
not the duty, to accept assignment of some or all of the Service
Provider's outstanding sub-consulting agreements, and the Service
Provider shall insert provisions in each sub-consulting agreement
stating that the sub-consultant consents to such assignment.

9.3    **Termination for Convenience.** The Authority may, upon thirty (30) days' written
notice to the Service Provider, terminate the Contract, in whole or specified part,
for its convenience. The notice of termination shall state the effective date of
termination, the extent of the termination, and any specific instructions MHA may
have for effecting an orderly termination.

9.3.1    After receiving notice of termination for convenience, the Service
Provider shall (1) stop work on the terminated portion of its work as of
the effective date of the termination, and stop placing subcontracts or
other orders there under; (2) consult with MHA regarding the
disposition of existing subcontracts, and use its best efforts to terminate
them on terms favorable to MHA; (3) consult with MHA to decide
what actions should be taken to mitigate the consequences of the
termination to MHA's operations; (4) take necessary or directed
actions to protect and preserve MHA's property in the Service
Provider's possession in which MHA has or may acquire an interest
and, as directed by the termination notice or other order from MHA,
deliver the property to MHA; and (5) promptly deliver to MHA any
Contract-related documents in its possession, as well as all computer
files it has prepared relating to its work pursuant to the Contract.

9.3.2    The Service Provider shall be entitled to receive only reasonable
payment for the work performed up to the date of termination. The
Service Provider shall not be entitled to payment for or on account of
profits on unperformed portions of the Contract work. If the Service
Provider contends and substantiates costs incurred beyond the direct
costs and overhead reflected in the contracted rate, the Service
Provider may submit a claim for such expenses to MHA for payment.
If MHA denies a claim by the Service Provider arising from termination
for convenience by MHA, both parties expressly agree that
participation in mediation as set forth in Article 10, Section 10.3, 10.4
shall be the course of action taken.

16

**9.3.3**    Payment of such amounts shall be the Service Provider's sole remedy for termination for convenience.

**9.4**    **Effect of Wrongful Default Termination.** If a termination for default is later determined to have been improperly effected, it shall be deemed to have been a termination for convenience and Paragraph 9.3 of this Agreement shall accordingly limit Service Provider's rights and remedies.

**9.5**    **Continued Responsibility after Termination.** If the Service Provider is terminated, either for default or otherwise, the Service Provider shall remain responsible for inadequacies in all work performed to the date of the termination.

17

07/09/2009 11:11 FAX   9017480092      TENCOSERVICESINC          ☒ 020/029

## ARTICLE 10
## CLAIMS AND DISPUTES

**10.1**   **Disputes Covered.** All disputes arising under or relating to this Contract, including any claims for damages for the alleged breach of the Contract, which are not disposed of by agreement, shall be resolved pursuant to this Article.

**10.2**   **Initial Determination by MHA.** All claims by the Service Provider shall be made in writing and submitted to MHA. A claim against MHA by the Program Manager shall be subject to a written decision by the Authorized Representative designated in the Memorandum of Communication and Authority. MHA shall, with reasonable promptness, but in any case within sixty (60) days, render a decision concerning any claim hereunder. MHA's written decision shall become final and binding, and not subject to further challenge in arbitration, unless the Service Provider demands mediation in writing (1) within 30 days after receiving MHA's written decision on a claim, or (2) if MHA fails to render a decision within the allowed time, within 30 days after the allowed period for MHA's decision has passed.

**10.3**   **Mandatory Mediation.** If the Service Provider is dissatisfied with MHA's decision on any claim it has asserted, or MHA fails to render a decision within the allowed time, the Service Provider may demand, in writing, that the parties submit the dispute to non-binding mediation pursuant to the then applicable rules of the American Arbitration Association. If MHA has a claim against the Service Provider, which has not been resolved by agreement within sixty (60) days of its first assertion, MHA may likewise demand mediation of the claim.

**10.4**   **Arbitration.** If the parties have failed to resolve their dispute through mediation within 90 days after mediation is demanded, or within such additional time as the parties may agree, in writing, then either party may demand that the dispute be resolved by binding arbitration pursuant to the then applicable rules of the American Arbitration Association. The parties expressly agree that all claims or disputes arising pursuant to or in connection with the Contract, or its breach, shall be resolved by binding arbitration, and that judgment may be entered upon any award rendered by the arbitrator(s) by any court of competent jurisdiction. All arbitration hearings and conferences shall be conducted in Memphis, Tennessee. The Service Provider expressly agrees that, before any hearing is held, it shall, at MHA's request, make available for MHA's inspection and copying, any documents in its possession, custody or control that relate to the Contract which have not already been provided to MHA. Participation in mediation as specified in Paragraphs 10.3 is a condition precedent to arbitration.

**10.5**   **Limitations.** The Service Provider may not bring any claim against MHA after receipt of final payment.

07/09/2009 11:12 FAX  9017480092          TENCOSERVICESINC                    ☎021/029

**10.6  Duty to Continue Performance.**  The Service Provider shall continue to perform its duties pursuant to the Contract, without delay, during the pendency of any claim or dispute, unless it has been terminated by MHA. Failure to proceed diligently in accordance with this provision shall be grounds for termination for default.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

**11.1  Service Provider's Records.**  The Service Provider shall maintain records of all work performed pursuant to the Contract, and the costs associated with that work, and make those records available to MHA, HUD, the Comptroller General of the United States, and their designated representatives, for review and audit at any time during the term of the Contract and for a period a five (5) years from the completion or other termination of the Contract.

**11.2  Cooperation in Litigation.**  The Service Provider shall advise MHA concerning any claim asserted by any design professional, contractor, construction manager, or other supplier of goods or services for the Department's Projects, and shall negotiate with the claimant to attempt to achieve a reasonable resolution of the claim. Negotiations shall be carried out in consultation with MHA and all proposed compromises or settlements shall be subject to its approval. If a claim is not amicably resolved, and proceeds to arbitration or litigation, the Service Provider shall, upon request, provide MHA's legal counsel with any documentation in its possession that is relevant to the claim, and shall make available for reasonable consultation with counsel those personnel with factual knowledge relevant to the claim. The Service Provider shall also make its personnel available for deposition or testimony at trial or arbitration hearings, without further compensation. However, if the Service Provider is required to perform additional analyses, other than those already prepared in the course of its duties, for use in arbitration or litigation, or for disputes resulting from contracts which the MHA executed prior to the date of this Agreement, it shall be entitled to an equitable adjustment of the Contract Price.

**11.3  Conflict of Interest.**  Pursuant to 24 CFR §85.36(b)(3), the Service Provider shall insure that it and persons working for it on this Project do not undertake any work for other individuals or institutions that places the Service Provider or MHA in an actual or potential conflict of interest position with any such entity. Upon learning of a situation that constitutes or appears to constitute an actual or potential conflict of interest, the Service Provider shall inform the MHA in writing of the situation. The MHA shall review the situation and notify the Service Provider in writing of the corrective action available to the Service Provider. The MHA may, at its sole discretion consent to or waive a conflict, but such consent or waiver must be issued in writing.

19

11.3.1    Based in part on federal regulations (24 C.F.R. 85.36(b) (3)), the
MHA's Contract with HUD, no employee, officer, or agent of the
MHA (HUD grantee) shall participate in the selection, or in the award
or administration of a contract supported by Federal funds if a conflict
of interest, real or apparent, would be involved. Such a conflict would
arise when (i) the employee, officer or agent; (ii) any member of his or
her immediate family; (iii) his or her partner; or (iv) an organization that
employs, or is about to employ, any of the above, has a financial or
other interest in the firm selected for award.

11.3.2    The MHA's or the Service Provider's officers, employees or agents
shall neither solicit nor accept gratuities, favors or anything of
monetary value from contractors, or parties to sub-contracts. To the
extent permitted by Tennessee or local law or regulations, such
standards or conduct shall provide for penalties, sanctions, or other
disciplinary actions for violations of such standards by the MHA's and
the Service Provider's officers, employees, or agents or by contractors
or their agents. The awarding agency may in regulation provide
additional prohibitions relative to real, apparent, or potential conflicts
of interest.

11.3.3    Neither the MHA nor the Service Provider or any of its contractors or
subcontractors shall enter into any contract, subcontract, or agreement,
in connection with any project or any property included or planned to
be included in any project, in which any member, officer, or employee
of the MHA, or any member of the governing body of the locality in
which the project is situated, or any member of the governing body of
the locality in which the MHA was activated, or in any other public
official of such locality or localities who exercises any responsibilities
or functions with respect to the project during his/her tenure or for two
years thereafter has any interest, direct or indirect. If any such present
or former member, officer, or employee of the MHA, or any such
governing body member or such other public official of such locality or
localities involuntarily acquires or had acquired prior to the beginning
of his/her tenure any such interest, and if such interest is immediately
disclosed to the MHA and such disclosure is entered upon the minutes
of the MHA, the MHA, with the prior approval of the Government,
may waive the prohibition contained in this subsection. Provided, that
any such present member, officer, or employee of the MHA shall not
participate in any action by the MHA relating to such contract,
subcontract, or arrangement.

11.3.4    No member, officer, or employee of the MHA, no member of the
governing body of the locality in which the project is situated, no

20

07/09/2009 11:13 FAX  8017480092          TENCOSERVICESINC                    023/028

member of the governing body of the locality in which the MHA was activated, and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, during his/her tenure or for two years thereafter, shall have any interest, direct or indirect, in this Agreement or the proceeds thereof.

11.3.5   The Service Provider warrants that to the best of its knowledge and belief and except as otherwise disclosed, he or she does not have any organizational conflict of interest which is defined as a situation in which the nature of work under this or any other contract with MHA and organizational, financial, contractual or other interest are such that (a) an award of the Contract may result in an unfair competitive advantage; or (b) the Service Provider's objectivity, in performing the contract Work may be impaired.

11.3.6   The Service Provider agrees that if after award it discovers organizational conflict of interest with respect to this Agreement, it shall make an immediate and full disclosure in writing to the MHA, which shall include a description of the action, which the Service Provider has taken or intends to take to eliminate or neutralize the conflict.

11.3.7   The MHA may, however, terminate the Agreement for the convenience of the MHA if it would be in the best interest of the MHA.

11.3.8   In the event the Service Provider was aware of an organizational conflict of interest before the award of this contract and intentionally did not disclose the conflict to the MHA, the MHA may terminate the Agreement for default.

11.3.9   The provisions of this clause shall be included in all subcontractor and consulting agreements resulting from the Project. The Service Provider shall include in such subcontracts and consulting agreements any necessary provisions to eliminate or neutralize conflicts of interest.

11.3.10  No member of or Delegate to Congress or other city or state government official shall be admitted to any share or part of this Agreement or to any benefit that may arise there from.

11.3.11  No member, officer, or employee of the MHA, no member of the Tennessee Legislature, and no other public official of the Memphis or Tennessee Government shall, during his/her tenure, and for one year thereafter, have any interest, direct or indirect, in this Agreement or in any subcontract under this Agreement, or in the proceeds thereof.

21

07/09/2009 11:13 FAX  8017480092          TENCOSERVICESINC                     ⓦ024/029

11.3.12  Furthermore, the Service Provider represents that it is and shall remain in compliance with federal restrictions on lobbying set forth in Section 319 of the Department of the Interior and Related Agencies Appropriations Act for Fiscal year 1990, 31 U.S.C. Subsection 1352, and related rules and regulations set forth at 54 Fed. Reg. 52,309 ff. (1989), as amended.

11.4  **Use of MHA Property by Service Provider.** If the Contract prescribes that the Service Provider shall utilize MHA Property for the performance of the Contract, the property shall be described in a Property Itemization Memorandum prepared by the MHA and presented to the Service Provider. Title to all property furnished to the Service Provider shall remain with the MHA. Title to all property acquired by the Service Provider shall immediately vest in the MHA upon purchase. The Service Provider shall not purchase property for the MHA without prior written approval of the Director. The Service Provider is prohibited from disposing of any MHA Property.

11.4.1  MHA Property shall be used solely for the performance of the Contract unless otherwise directed in writing by the Director. The Service Provider shall be responsible and accountable for the MHA Property and is required to keep separate records of concerning the property indicating date acquired, vendor, cost, manufacturer, serial number, location of property and proposed disposition at the end of the Contract. The Service Provider shall furnish reports as to the location and condition of the property on a quarterly basis.

11.4.2  All MHA Property shall be clearly identified and labeled as the "Property of the MHA." The Service Provider shall make the MHA Property available for inspection by the MHA at all times.

11.4.3  The Service Provider shall be liable for any loss or damage to the MHA Property. The Service Provider shall, unless otherwise indicated in this Agreement, maintain the MHA Property and shall use it safely and protect it from damage, undue wear or loss. If insurance coverage is required by this Contract for any or all MHA Property, the Service Provider shall maintain adequate insurance coverage on the specified property. If the Service Provider is indemnified, reimbursed or otherwise compensated for any loss, damage or destruction of MHA Property, written notice of such action shall be sent to the Authorized Representative. At the MHA's direction, the Service Provider will be authorized to (a) utilize the proceeds to repair, restore or replace the property involved; (b) credit the MHA against the Contract Amount, or (c) reimburse the MHA.

22

07/08/2009 11:13 FAX  9017480092          TENCOSERVICESINC                    ☒025/029

11.4.4   At the close of the Contract and prior to final payment or upon the termination of the Contract, the Service Provider shall return all MHA Property to the MHA and deliver MHA an inventory showing each item, its description, location and condition.

11.5   **Assignment Prohibited.** MHA has entered into the Contract in reliance upon the unique knowledge, experience and expertise of the Service Provider. The Service Provider shall therefore not transfer, delegate, subcontract or otherwise convey its duties under the Contract without the prior written consent of MHA, which may be withheld in MHA's sole discretion. The Service Provider shall not assign to any other person or entity its right to enter into the Contract.

11.6   **Prohibition Against Liens.** In accordance with HUD regulations, the Service Provider, sub-consultants, subcontractors or suppliers at any tier are prohibited from placing a lien on MHA property.

11.7   **Drug-Free Workplace.** The Service Provider shall certify that it agrees to provide a Drug-Free Workplace for its employees. In addition, the Service Provider shall assure that all personnel assigned to perform work/services under the Contract pass a drug test.

11.8   **Buy American Act.** The Service Provider shall comply with the provisions of the Buy American Act, 41 U.S.C. §§10a-d in carrying out its duties pursuant to this Contract.

11.9   **Cumulative Law.** The Contract shall be governed by and construed in accordance with the laws of Tennessee, without regard to its conflict of laws principles, except to the extent that federal laws apply.

11.10   **Remedies Cumulative.** All rights and remedies provided to the parties under the Contract shall be cumulative, not exclusive. The parties may, at their discretion, avail themselves of any remedy permitted by the Contract, at law or in equity, and the exercise of one or more remedies by a party shall not preclude the simultaneous or subsequent exercise of other remedies.

11.11   **Captions.** Any table of contents, titles, section headings, or other captions contained in the Agreement are solely to facilitate reference and in no way affect, limit, or cast light upon the interpretation or construction of the Contract.

11.12   **Counterparts.** The Agreement may be executed in counterparts which, when taken together, shall constitute a single agreement.

11.13   **Severability.** If any provisions of this Contract shall be determined by any court of competent jurisdiction to be invalid or unenforceable, the remainder of the Contract other than the portions determined to be invalid or unenforceable shall

23

07/03/2008 11:14 FAX  9017480092          TENCOSERVICESINC                          ☒ 028/029

not be affected thereby, and each valid provision hereof shall be enforced to the fullest extent permitted by law.

11.14  **No Waiver.**  Failure to insist upon strict compliance with any of the terms, covenants, and conditions hereof shall not be deemed a waiver of such terms, covenants, or conditions, nor shall any waiver or relinquishment of any right or power hereunder at any one time or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

11.15  **Option to Extend.**  The Memphis Housing Authority may extend the term of this Contract for a period of one (1) year by giving written notice to the Service Provider by the expiration date of this Contract or within thirty (30) days after funds are made available for exercising the option, whichever is later.

**IN WITNESS WHEREOF,** and intending to be bound thereby, the parties have duly executed this Agreement as of the date above stated.

**SCRUGGS SECURITY                    MEMPHIS HOUSING AUTHORITY
AND PATROL, LLC**

By: _____                By: _____
    Billy Scruggs                        Addie Holmes-Moore
Title:  President                    Title:  Alternate Contracting Officer

Date: 10-29-2001                     Date: 29 October, 2001

24

07/09/2009 11:14 FAX 9017480092     TENCOSERVICESINC      ⌀027/029

Mar 22 02 09:57a      p.1

## MEMPHIS HOUSING AUTHORITY
### SECURITY INVESTIGATIVE DIVISION

# POST ORDERS
# FOR
# HIGH RISE CONTRACT SECURITY

### MISSION

The mission of the contracted security officers deployed in the four (4) high rise developments of the Memphis Housing Authority (MHA) is to provide internal and external control of the apartment building and parking lot by monitoring the people that visit the property and the residents, visitors and their property both inside the building and on the parking lot.

### UNIFORM

These post require a uniform that is presentable and will distinguish the officer's appearance. Civilian clothing is not acceptable.

### WEAPONS

Security Officers on post in the high rises will be armed.

### CONDUCT

These are high public contact posts and only the highest standards of conduct are acceptable. Be polite and courteous, but maintain a professional distance. Assist the elderly and handicapped people in and out of the front door when appropriate. If asked, escort people to and from their cars. No profanity or vulgar language is allowed. The possession and/or use of alcohol or any illicit drugs are strictly forbidden by post officers. The post officers will not attempt to sell anything to residents. Amusement or entertainment devices are not allowed on the post officers. Post officers will not encourage personal phone calls or personal visitors on the post. Becoming overly friendly with the residents will open the door for them to take advantage of the post officer later.

1

07/09/2009 11:15 FAX  9017480092          TENCOSERVICESINC                    ⊠ 028/029

Mar 22 02 09:58a                                                             p.2

## POST OR WORK STATION

There will be a desk situation in the lobby of each high rise, close to the
entrance of the building. The following items should be kept at the post at all
times.

♦ Log Sheet for Post Officer
♦ Offense Report Forms
♦ Note Pads
♦ Key Card to front door

(Post Phone Numbers)

♦ Jefferson Square           544-1810
♦ Borda Towers               544-1210
♦ Venson Center              544-1686
♦ Barry Homes                544-1240

Sign In and Out Book and pen should be on the desk in plain view at all
times.

Lists of persons that have been placed on Authorization of Agency List are
not allowed in the building for any reason.

(Needed Telephone Numbers)

♦ MHA Security Staff          544-1233
♦ Emergency Crew             544-1879 / 1882 / 1883
♦ Memphis Police Department   545-2677
♦ Memphis Fire and Ambulance  458-3311
♦ Extreme Emergency          911

Other numbers needed are the home and pager numbers for the
development manager, also the home and pager numbers for the engineer of the
assigned high rise.

2

07/08/2009 11:15 FAX  9017480092          TENCOSERVICESINC                    ☒028/029

ßec 22 02 08:58a                                                             p.3

## GENERAL POST ORDERS    (All Shifts)

1.  Keep the area around your post clean at all times. The Visitors' Log Sheet
    and a pen are the only items that should be on top of your desk. Keep the
    phone in the desk drawer unless it is in use. This is not a public phone
    and should be used only to conduct your business as a Post Officer. Get
    to the point on your business calls in order for MHA or your company staff
    to get the line when calling you.

2.  Residents entering the building should have their own personal key card
    to open the door. IF THE RESIDENTS DOES NOT HAVE THEIR KEY
    CARD AND YOU KNOW THEM BY SIGHT; YOU MAY OPEN THE DOOR
    FOR THEM. IF YOU DON'T KNOW THEM BY SIGHT, REQUIRE THESE
    RESIDENTS TO SIGN THE VISITOR'S LOG AND NOTE THEY DID NOT
    HAVE THEIR CARD. IN ADDITION REQUIRE THE RESIDENTS TO
    SHOW SOME ID.Visitors should not have key cards to open the door.
    When you observe this, generate an offense report on this infraction for
    the high rise manager.

3.  When visitors come to see residents you will have to open the door for
    them. Require all visitors to show A PICTURE ID (STATE ID OR
    DRIVER'S LICENSES ARE NOT MANDATORY) or two other forms of ID.
    Require them to complete all information on the visitor's log. This is very
    important and must be complied with. If the visitor refuses to cooperate
    with your request do not grant them permission to visit with residents.

4.  When a visitor comes to the high rise to visit a resident and they do not
    have the proper ID; the first occurrence, require the resident to come to
    the lobby  and verify the identity of the visitor. Inform the visitor and the
    resident that when this visitor returns to visit, he/she will have to have

# Exhibit 2

07/09/2009 11:04 FAX 8017480082          TEHCOSERVICESINC          ☒ 002/028

OCT. 22, 2001  12:44PM          NO.498   P.2/2

**CERTIFICATE OF INSURANCE**

10/22/01

CLAY & LAND INSURANCE, INC.
P.O. BOX 171316
MEMPHIS, TN  38187-1316

COMPANIES AFFORDING COVERAGE

COMPANY A   STATES INSURANCE GROUP

SIMMON'S SECURITY & PATROL, L.L.C.
780 ADAMS STREET, SUITE 103
MEMPHIS, TN  38103

| TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE | POLICY EXPIRATION DATE | ALL LIMITS IN THOUSANDS |
|---|---|---|---|---|
| GENERAL LIABILITY | | | | GENERAL AGGREGATE  $ 1,000. |
| COMMERCIAL GENERAL LIABILITY | SOL3747441-00 | 07/16/01 | 07/16/02 | PRODUCTS-COMP/OPS AGGREGATE  $ 1,000. |
| | | | | PERSONAL & ADVERTISING INJURY  $ 1,000. |
| | | | | EACH OCCURRENCE  $ 1,000. |
| | | | | FIRE DAMAGE  $ 0. |
| | | | | MEDICAL EXPENSE  $ 5. |

COMMERCIAL GENERAL LIABILITY AND
SECURITY GUARD ERRORS AND OMISSIONS POLICY
Declarations



AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY
New York, New York
Administrative Offices – 1400 American Lane
Schaumburg, Illinois 60196-1056

**ZURICH**

Policy Number EOL3747442-00

| Item 1. Named Insured and Address (Number, Street, Town or City, County, State, Zip Code) | Producer Name Victor O. Schinnerer & Company, Inc. |
|---|---|
| | Item 2. Location of all premises you own, rent or occupy (including zip code). |

Scruggs Security & Patrol
750 Adams Street
Suite 103
Memphis, TN 38103

Item 3. Policy Period: From: 07/16/2001 To: 07/16/2002
12:01 A.M. Standard Time at the address shown in Item 1.

Item 4. Limits of Liability     Per Occurrence/Offense Limit

A. Coverage A: Bodily Injury and Property Damage Liability
B. Coverage B: Personal Injury and Advertising Injury Liability
C. Coverage C: Medical Payments

Annual Aggregate Limit for all coverage listed above

Item 5. Deductible (applicable to damages, judgments, settlements, defense expenses and costs)

 per claim

Item 6. Form of Named Insured Business

Other (specify) _____

| Item 7. Premium Classification | Code Number | Premium Basis | Rate | Premium |
|---|---|---|---|---|
| Security & Patrol Agency | 98751 |  | | |

Item 8. Forms and Endorsements attached at issue.

See Schedule of Forms and Endorsements attached

By acceptance of this policy the Insured agrees that the statements in the Declaration and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Remarks | Countersigned at | Authorized Representative | Date Countersigned |
|---|---|---|---|
| Ref. 0021h0 | Chevy Chase, MD | *James F. Willging* | 07/24/2001 |

U-SGP-D-111-A CW (10/95)

⌐7.5%

COMMERCIAL GENERAL LIABILITY AND
SECURITY GUARD ERRORS AND OMISSIONS POLICY
Declarations

AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY
1400 American Lane
Schaumburg, IL 60196-1056



**ZURICH**

Policy Number  SGL3747442-00

**Schedule of Forms and Endorsements**

| | |
|---|---|
| U-SGP-110A CW (10/95) | COVERAGE DOCUMENT |
| U-SGP-D-111-A CW (10/95) | DECLARATIONS |
| U-SGP-113-A CW | CANINE EXCLUSION |
| U-SGP-115-A CW | ALARM EXCLUSION |
| U-SGP-116-A CW | NUCLEAR ENERGY LIABILITY |
| U-SGP-118-A CW | PERSONAL INJURY |
| U-SGP-119-A CW | ASSAULT AND BATTERY COVERAGE |
| U-SGP-117-A CW | LOST KEY COVERAGE |
| U-SGP-114-A CW | MODIFIED THEFT EXCLUSION |
| U-SGP-141-A TN | CANCELLATION & NONRENEWAL-TN |
| U-SGP-159-A TN | AMENDATORY ENDORSEMENT-TN |
| U-SGP-112-A CW | WAGE FREEZE ENDORSEMENT |

Zurich-American Insurance Group


**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00      Effective: 07/16/01   Endorsement Number:   1

Canine Exclusion

**THIS ENDORSEMENT AMENDS THE POLICY – PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, Subsection 2. of Section I Coverages, Coverage A.   Bodily Injury And Property Damage Liability, is amended by the addition of the following exclusion:

"Bodily injury"  or "property damage"  arising out of the ownership,  rental, maintenance or use of dogs in connection with "security guard operations."

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-113-A CW
(10/95)
I002140-B040170

Countersigned by Authorized Representative

Zurich-American Insurance Group


**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01    Endorsement Number:    2

Alarm Exclusion

**THIS ENDORSEMENT AMENDS THE POLICY — PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, Subsection 2. of Section I — Coverages, Coverage A. Bodily Injury And Property Damage Liability, is amended by the addition of the following exclusion:

    "Bodily injury" or "property damage"  arising out of or contributed to by the ownership, maintenance, operation, use or installation of any alarm, alarm device, alarm component or alarm system in connection with "security guard operations."

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGP-115-A CW
(10/95)
I002140-B040170

<u>Countersigned by Authorized Representative</u>

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01   Endorsement Number:   3

Nuclear Energy Liability (Broad Form)

THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Commercial General Liability And Security Guard Errors And Omissions Policy

In consideration of the premium charged, Subsection 2. of Section I - Coverages, Coverage A. Bodily Injury And Property Damage Liability and Subsection 2. of Section I Coverages, Coverage B. Personal Injury And Advertising Injury Liability, are amended by the addition of the following exclusion:

(1) Under any liability coverage, to "bodily injury" or "property damage:"

    (a) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

(2) Under any medical payments coverage, expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

(3) Under any liability coverage, "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material," if:

    (a) The "nuclear material" (i) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or

PAGE 1

Zurich-American Insurance Group



INSURED: Scruggs Security & Patrol                                    **ZURICH**
Policy : EOL3747442-00        Effective: 07/16/01    Endorsement Number:    3

   (ii) has been discharged or dispersed therefrom;

   (b) The "nuclear material" is contained in "spent fuel" or
       "waste" at any time possessed, handled, used,
       processed, stored, transported or disposed of by or on
       behalf of an insured; or

   (c) The "bodily injury" or "property damage" arises out of
       the furnishing by an insured of services, materials,
       parts or equipment in connection with the planning,
       construction, maintenance, operation or use of any
       "nuclear facility", but if such facility is located
       within the United States of America, its territories or
       possessions or Canada, this exclusion (3) applies only
       to "property damage" to such a "nuclear facility" and
       any property thereat.

(4) As used in this endorsement:

   "Hazardous properties" include radioactive, toxic or
   explosive properties;

   "Nuclear material" means "source material," "special nuclear
   material," or "by-product material;"

   "Source material," "special nuclear material," and "by-
   product material" have the meanings given them in the
   Atomic Energy Act of 1954 or in any law amendatory thereof;

   "Spent fuel" means any fuel element or fuel component, solid
   or liquid, which has been used or exposed to radiation in a
   "nuclear reactor;"

   "Waste" means any waste material (a) containing "byproduct
   material" other than the tailings or wastes produced by the
   extraction or concentration of uranium or thorium from any
   ore processed primarily for its "source material" content,
   and (b) resulting from the operation by any person or
   organization of any "nuclear facility" included under
   paragraphs (a) and (b) of the definition of "nuclear
   facility."

(5) "Nuclear facility" means:

   (a) Any "nuclear reactor;"

   (b) Any equipment or device designed or used for (i)
       separating the isotopes of uranium or plutonium, (ii)
       processing or utilizing "spent fuel," or (iii)
       handling, processing or packaging "waste;"

   (c) Any equipment or device used for the processing,

                        PAGE 2

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01   Endorsement Number:   3

fabricating or alloying of "special nuclear material"
if at any time the total amount of such material in the
custody of the "insured" at the premises where such
equipment or device is located consists of or contains
more than 25 grams of plutonium or uranium 233 or any
combination thereof, or more than 250 grams of uranium
235;

(d) Any structure, basin, excavation, premises or place
prepared or used for the storage or disposal of
"waste;"

and includes the site on which any of the foregoing is
located, all operations conducted on such site and premises
used for such operations;

"Nuclear reactor" means any apparatus designed or used to
sustain nuclear fission in a self-supporting chain reaction
or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive
contamination of property.

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGP-116-A CW
(10/95)
1002140-B040170

Countersigned by Authorized Representative

PAGE  3

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : BOL3747442-00      Effective: 07/16/01     Endorsement Number:    4

Amendatory Endorsement - Personal Injury

**THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, it is agreed that subparagraph a.(4) of paragraph 2., Exclusions, Coverage B. Personal Injury and Advertising Injury Liability, Section I, Coverage is deleted in its entirety and replaced by the following:

     a. "Personal injury" or "advertising injury:"

         (4) For which an insured has assumed liability in a contract or agreement. Notwithstanding the foregoing, this exclusion does not apply to liability:

            a) Assumed in a contract or agreement that is an "insured contract"; or

            b) That an insured would have in the absence of the contract or agreement.

It is further agreed that Subsection 9. a. (7) of Section V - Definitions is deleted in its entirety and replaced by the following:

     9.a. "Insured contract" means:

         (7) Subject to Subsection 9 b.(4), that part of part of any other contract or agreement pertaining to an insured's business under which an insured assumes the tort liability of another to pay damages because of "bodily injury," "property damage" or "personal injury" to a person or organization, if the contract or agreement was made prior to the "bodily injury," "property damage" or "personal injury." Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

PAGE 1

Zurich-American Insurance Group

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00        Effective: 07/16/01   Endorsement Number:   4

**ZURICH**

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGP-118-A CW
(10/95)
I002140-B040170

Countersigned by Authorized Representative

PAGE  2

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00     Effective: 07/16/01    Endorsement Number:   5

Assault and Battery Coverage

**THIS ENDORSEMENT AMENDS THE POLICY – PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

The following replaces paragraph a. of **Section I., Part 2., Exclusions:**

a. "Bodily injury" or "property damage" expected or intended from the standpoint of an insured. This exclusion does not apply to:

    **(1)** "Bodily injury" or "property damage" resulting from the use of physical force to protect persons or property.

    **(2)** Alleged or actual negligent hiring, improper training or inadequate supervision by a person or organization who acts as the employer of a security guard insured under this policy, when such security guard's acts result in "bodily injury" or "property damage."

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-119-A CW
(12/95)
I002140-B040170

Countersigned by Authorized Representative

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01   Endorsement Number:      6

Amendatory Endorsement - Lost Key Coverage

THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, it is agreed that subparagraph (d) is added to Subsection 1. Insuring Agreement of the provision entitled Coverage A - Bodily Injury and Property Damage Liability of Section 1. Coverages.

d.  We will pay, subject to provisions a, b and c above, those sums that the insured becomes legally obligated to pay as "damages" because of "property damage" resulting from the loss of keys in the possession of the insured or of his employees. Notwithstanding the foregoing, this coverage shall not apply to "property damage" caused by any misappropriation, secretion, conversion, infidelity or any dishonest act on the part of any insured, or any employee or agent of any insured. Liability for "property damage" due to lost keys is furthermore limited to the actual cost of keys, adjustment of locks to accept new keys or new locks, if required, including their installation.

All other terms and conditions of this policy remain unchanged.

U-SGP-117-A CW
(10/95)
I002140-B040170

*James F. Wilging*

Countersigned by Authorized Representative

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01   Endorsement Number:   7

**Modified Theft Exclusion**

THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, Exclusion (o) of Subsection 2. of **Section I - Coverages, Coverage A. Bodily Injury And Property** Damage Liability, is deleted in its entirety, and Definition (18), "Property Damage," in **Section V - Definitions**, is amended by the addition of the following provision:

    c.  Theft or loss of property. However, "property damage" does not mean:

        (1)  Theft by an insured or any employee of an insured;

        (2)  Theft or loss of money, securities or other valuables of others, while being transported by an insured or held on an insured's premises;

        (3)  Loss or that part of any loss of inventory, the proof of which, either as to its factual existence or as to its amount, depends upon (a) an inventory computation or actual physical count, (b) a comparison of inventory records with any actual physical count of inventory or (c) a profit and loss computation to establish the amount of any loss; or

        (4)  Any liability for "damages" or "defense expenses" arising from theft or loss of property assumed by an insured in a contract or agreement that is an "insured contract," unless such liability would be covered hereunder in the absence of such contract or agreement.

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-114-A CW
(10/95)
I002140-B040170

Countersigned by Authorized Representative

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01    Endorsement Number:    8

Cancellation and Nonrenewal - Tennessee

THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the:

Commercial General Liability And Security Guard Errors And Omissions Policy

In consideration of the premium charged, it is agreed that Section IV, subsection 3. Cancellation is deleted in its entirety and replaced by the following:

**Cancellation**

1.  This policy may be canceled by you by surrender thereof to us or by mailing to us written notice stating when thereafter such cancellation shall be effective. If canceled by you, we shall retain the customary short rate proportion of the premium.

2.  If this policy has been in effect for fewer than sixty (60) days and is not a renewal, we may cancel this policy by mailing or delivering to you, at the address shown in the policy, written notice of cancellation at least ten (10) days before the effective date of cancellation.

3.  If this policy has been in effect for sixty (60) days or more, or is a renewal, we may not cancel this policy except for any one of the following reasons:

    (a)  Nonpayment of premium, including nonpayment of any additional premiums, calculated in accordance with the current rating manual of the Company, justified by a physical change in the insured property or a change in its occupancy or use;

    (b)  Conviction of the Named Insured of a crime having as one of its necessary elements an act increasing any hazard insured against;

    (c)  Discovery of fraud or material misrepresentation on the part of either of the following:

        (1)  The insured or his representative in obtaining the policy; or

        (2)  The Named Insured in pursuing a claim under the policy;

                        PAGE  1

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01    Endorsement Number:     8

    (d) Failure to comply with written loss control recommendations;

    (e) Material change in the risk which increases the risk of loss after the policy has been issued or renewed;

    (f) Determination by the Commissioner that the continuation of the policy would jeopardize the Company's the policy would jeopardize the Company's solvency or would place the Company in violation of the insurance laws of this state or any other state;

    (g) Violation or breach by the insured of any policy terms or conditions; or

    (h) Such other reasons that are approved by the Commissioner.

4.    If we cancel this policy in accordance with paragraph 3. above, cancellation may be effected by mailing or delivering to you, at the address shown in the policy, written notice of cancellation at least ten (10) days before the effective date of cancellation.

5.    If we cancel this policy for any reason set forth in paragraph c. above, we will identify the reason for cancellation in the cancellation notice.

6.    If we cancel this policy, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

7.    The mailing of any notice pursuant to this provision shall be sufficient proof of notice. Delivery of such written notice shall be the equivalent of mailing.

**Nonrenewal**

1.    If we decide not to renew this policy, we shall deliver or mail written notice at least sixty (60) days before the policy expiration date to you at the address shown in the policy.

2.    Notice of nonrenewal is not required if you have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

PAGE  2

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00        Effective: 07/16/01   Endorsement Number:      8

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-141-A TN
(12/95)
1002140-B040170

Countersigned by Authorized Representative

PAGE  3

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01    Endorsement Number:    9

Amendatory Endorsement – Tennessee

**THIS ENDORSEMENT AMENDS THE POLICY – PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, it is agreed that **Section V – Definitions**, subsection 6. "Damages" is deleted in its entirety and replaced by the following.

6. "Damages" means all sums that an insured becomes legally obligated to pay as a result of "claims" or "suits" either by adjudication or settlement, after making proper deductions for all recoveries and salvages collectible. "Damages" includes damages claimed by any . person or organization for care, loss of services or death resulting from "bodily injury." However, "damages" do not include taxes, fines, penalties or matters which may be deemed uninsurable under the law pursuant to which this policy is construed or "defense expenses."

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-159-A TN
(1/96)
I002140-B040170

Countersigned by Authorized Representative

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00     Effective: 07/16/01   Endorsement Number: 10

Wage Freeze Endorsement

**THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, and notwithstanding Condition 6., Premium Audit, of Section IV - Commercial General Liability And Security Guard Errors and Omissions Conditions, if you maintain adequate payroll records demonstrating that the maximum hourly wages you pay exceed $4.50, then the amount of hourly wages that we will use to compute your audit premiums for the period 07/16/2001 to 07/16/2002 will not exceed this maximum amount for such period.

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGP-112-A CW
(10/95)
I002140-B040170

Countersigned by Authorized Representative



**ZURICH**

# Commercial General Liability
# Security Guard Errors and Omissions Policy

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

**"Defense Expenses" covered by this policy are included within the limits of liability shown in the declarations.**

**The deductible amount shown in the declarations will be paid by the Named Insured and will be applicable to all "Damages" and "Defense Expenses" for each and every "Claim" or "Suit". The deductible will be deemed to be applied first to the "Damages" and/or "Defense Expenses."**

Deductible amounts must be paid by the Named Insured within thirty (30) days of receipt of our written demand therefor.

Our determination as to the reasonableness of any "defense expenses" will be conclusive on the Named Insured.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **Section II - Who Is An Insured.**

Words and phrases that appear in quotation marks have special meaning. Refer to **Section V - Definitions.**

**Section I - Coverages**

**Coverage A. Bodily Injury and Property Damage Liability**

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "bodily injury" or "property damage" caused by an "occurrence" that takes place during the policy period in the "coverage territory," or caused by errors or omissions related to "security guard operations" that take place during the policy period in the "coverage territory."

   b. We will have the right and duty to defend any "suit" seeking those "damages." But:

      (1) The amount we will pay for the combined amount of "damages" and "defense expenses" is limited as described in **Section III - Limits of Liability;**

      (2) We may investigate and settle any "claim" or "suit" at our discretion; and

      (3) Our right and duty to defend end when we have used up the applicable Limit of Liability in the

payment of "damages" and/or "defense expenses" under this policy.

   c. "Property damage" that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the "occurrence" that caused it.

2. Exclusions

   This insurance does not apply to:

   a. "Bodily injury" or "property damage" expected or intended from the standpoint of an insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of physical force to protect persons or property.

   b. "Bodily injury" or "property damage" for which an insured is obligated to pay "damages" or "defense expenses" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability:

      (1) Assumed in a contract or agreement that is an "insured contract"; or

      (2) That an insured would have in the absence of the contract or agreement.

   c. "Bodily injury" or "property damage" for which any insured may be held liable for reason of:

      (1) Causing or contributing to the intoxication of any person;

      (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

      (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

      This exclusion applies only if the insured is in the business of manufacturing, distributing, selling, servicing or furnishing alcoholic beverages.

   d. Any obligation of an insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

U-SGP-110-A CW (10/95)
Page 1 of 12

e. (1) "Bodily injury" to an employee of an insured arising out of and in the course of employment by the insured; or

(2) "Bodily injury" to the spouse, child, parent, brother or sister of the employee as a consequence of (e)(1).

This exclusion applies:

(a) Whether the insured may be liable as an employer in any other capacity; and

(b) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by an insured under an "insured contract."

f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises an insured owns, rents or occupies;

(b) At or from any site or locations used by or for an insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of or processed as waste by or for an insured or any person or organization for whom or for which an insured may be legally responsible; or

(d) At or from any site or location on which an insured or any contractors or subcontractors working directly or indirectly on an insured's behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) Any loss, cost or expense arising out of any governmental direction or request that an insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be disposed of, recycled, reconditioned or reclaimed.

g. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion does not apply to:

(1) A watercraft while ashore on premises an insured owns or rents;

(2) A watercraft an insured does not own that is:

(a) Less than twenty-six (26) feet long; and

(b) Not being used to carry persons or property for a charge.

(3) Parking an "auto" on, or on the ways next to, premises an insured owns or rents, provided the "auto" is not owned by or rented or loaned to an insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Section V(13)(f)(2) or Section V(13)(f)(3) of the definition of "mobile equipment."

h. "Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

i. "Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. "Property damage" to:

(1) Property an insured owns, rents or occupies;

(2) Premises an insured sells, gives way or abandons, if the "property damage" arises out of any part of those premises;

(3) Property loaned to an insured;

(4) Personal property in an insured's care, custody or control;

**(5)** That particular part of real property on which an insured or any contractors or subcontractors working directly or indirectly on an insured's behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because an "insured's work" was incorrectly performed on it.

Subsection (2) of this exclusion does not apply if the premises are an "insured's work" and were never occupied, rented or held for rental by an insured. Subsections (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement. Subsections (4), (5) and (6) of this exclusion do not apply to "property damage" arising out of "security guard operations." Subsection (6) of this exclusion does not apply to "property damage" included in the "products completed operations hazard."

**k.** "Property damage" to an "insured's product" arising out of it or any part of it.

**l.** "Property damage" to an "insured's work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on an insured's behalf by a subcontractor.

**m.** "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in an "insured's product" or an "insured's work"; or

**(2)** A delay or failure by an insured or anyone acting on an insured's behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to an "insured's product" or an "insured's work" after it has been put to its intended use.

**n.** "Property damage" claimed for any loss, cost or expense incurred by an insured or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** The "insured's product";

**(2)** The "insured's work"; or

**(3)** "Impaired property":

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.** "Property damage" arising from or contributed to by theft, burglary, robbery, mysterious disappearance, inventory shortage or inventory shrinkage.

Exclusions (c) through (n) above do not apply to damage by fire to premises rented to an insured.

## Coverage B. Personal Injury and Advertising Injury Liability

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "personal injury" or "advertising injury" caused by an "offense" that takes place during the policy period in the "coverage territory," or caused by errors or omissions related to "security guard operations" that take place during the policy period in the "coverage territory."

**b.** We will have the right and duty to defend any "suit" seeking those "damages." But:

**(1)** The amount we will pay for the combined amount of "damages" and "defense expenses" is limited as described in **Section III - Limits of Liability**;

**(2)** We may investigate and settle any "claim" or "suit" at our discretion; and

**(3)** Our right and duty to defend end when we have used up the applicable Limit of Liability in the payment of "damages" and/or "defense expenses" under this policy.

**c.** This insurance applies to "personal injury" only if caused by an "offense":

**(1)** Committed in the "coverage territory" during the policy period; and

**(2)** Arising out of the conduct of an insured's business, excluding advertising, publishing, broadcasting or telecasting done by or for an insured.

**d.** This insurance applies to "advertising injury" only if caused by an "offense" committed:

**(1)** In the "coverage territory" during the policy period; and

**(2)** In the course of advertising an insured's goods, products or services.

U-SGP-110-A CW (10/95)
Page 3 of 12

2. Exclusions

This insurance does not apply to:

a. "Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of an insured with the knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of an insured; or

(4) For which an insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

b. "Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An "offense" committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

c. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises an insured owns, rents or occupies;

(b) At or from any site or locations used by or for an insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for an insured or any person or organization for whom or for which an insured may be legally responsible; or

(d) At or from any site or location on which an insured or any contractors or subcontractors working directly or indirectly on an insured's behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations;

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) Any loss, cost or expense arising out of any governmental direction or request that an insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be disposed of, recycled, reconditioned or reclaimed.

**Coverage C. Medical Payments**

1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises an insured owns or rents;

(2) On ways next to premises an insured owns or rents; or

(3) Because of an insured's operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The medical expenses are incurred and reported to us within one (1) year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable Limit of Liability. We will pay reasonable medical expenses for:

(1) First aid at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions

We will not pay medical expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises any insured owns or rents that the person normally occupies.

d. To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable

U-SGP-110-A CW (10/95)
Page 4 of 12

or must be provided under a workers compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard."

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**Section II - Who Is An Insured**

1. If you are designated in the Declaration as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Your employees, other than your executive officers, but only for acts within the scope of their employment by you. However, none of these employees is an insured for:

      (1) "Bodily injury" or "personal injury" to you or to a co-employee while in the course of his or her employment;

      (2) "Bodily injury" or "personal injury" arising out of his or her providing or failing to provide professional health care services; or

      (3) "Property damage" to property owned or occupied by or rented or loaned to that employee, any of your other employees, or any of your partners or members (if you are a partnership or joint venture).

   b. Any person (other than your employee), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-employee of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the ninetieth (90th) day after you acquire or form the organization or, the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an "offense" committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in Item 1 of the Declarations.

**Section III - Limits of Liability**

1. The respective Per Occurrence Limit of Liability amounts shown in Item 4 of the Declarations are the most we will pay under this policy in total for "damages" and "defense expenses" under Coverage A resulting from any one "occurrence," for "damages" and "defense expenses" under Coverage B resulting from any one "offense" and for medical expenses under Coverage C resulting from any one "occurrence," regardless of the number of:

   a. Persons and organizations who or which are insureds under this policy;

   b. "Claims" made or "suits" brought against any or all insured; and

   c. Persons or organizations making "claims" or bringing "suits."

U-SGP-110-A CW (10/95)
Page 5 of 12

2. The Annual Aggregate Limit of Liability amount shown in Item 4 of the Declarations is the most we will pay under this policy in total for "damages" and "defense expenses" under Coverage **A**, "damages" and "defense expenses" under Coverage **B** and medical expenses under Coverage **C** during the policy period shown in Item 3 of the Declarations.

The respective Per Occurrence and Annual Aggregate Limit of Liability amounts shown in Item 4 of the Declarations apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in Item **3** of the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Liability.

### Section IV - Commercial General Liability and Security Guard Errors and Omissions Conditions

1. Bankruptcy.

   Bankruptcy or insolvency of an insured or of an insured's estate will not relieve us of our obligations under this policy.

2. Duties in the event of "Occurrence," "Offense," "Claim" or "Suit."

   a. You must see to it that we are notified promptly of an "occurrence" or an "offense" which may result in a "claim." Notice should include:

      (1) How, when and where the "occurrence" or the "offense" took place; and

      (2) The names and addresses of any injured persons and witnesses.

   b. If a "claim" is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the "claim" or "suit."

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, negotiation, settlement or defense of the "claim" or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization who or which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

3. Cancellation

   a. You may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   b. We may cancel this policy by mailing or delivering to you written notice of cancellation at least:

      (1) ten (10) days before the effective date of cancellation, if cancellation is for nonpayment of premium; or

      (2) thirty (30) days before the effective date of cancellation, if cancellation is for any other reason, unless applicable statutes or regulations require us to provide greater notice.

   c. We will mail or deliver our notice to your address shown in Item 1 of the Declarations.

   d. Notice of cancellation will state the effective date and hour of cancellation, which will become the end

   e. If this policy is cancelled, we will send you any premium refund due.

      If you cancel, the earned premium will be computed on the basis of our short-rate table and procedure. If we cancel, the earned premium will be computed on a pro rata basis.

      Such refund, if any, will be made as soon as practicable after the cancellation becomes effective.

      The cancellation will be effective even if we have not made or offered a refund.

   f. If notice is mailed, proof of mailing will be sufficient proof of notice.

   g. If we offer to renew this policy on terms or premiums different from those in effect during the policy period, such offer will constitute cancellation or refusal to renew this policy.

4. Legal Action Against Us

   a. Legal Action Brought by a Third Party against Us.

      No third party has a right under this policy:

      (1) To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

      (2) To sue us; however, a third party may sue us to recover on an agreed settlement or on a final judgement against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Liability shown in the Declarations. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

   b. Legal Action Brought By An Insured Against Us.

Any controversy or dispute between an insured and us which arises out of or relates to an interpretation or breach of this policy will be settled by binding arbitration in accordance with the Rules of the American Arbitration Association. Arbitration shall take place in the State of New York, unless otherwise agreed by both the insured and us. The arbitration process will be governed by and conducted in accordance with the laws of the State of New York. Judgement upon the arbitration award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

The terms of this policy are to be construed in an evenhanded fashion as between the insured and us in accordance with the laws of the State of New York.

Where the language of this policy is deemed to be ambiguous or otherwise unclear, the issue will be resolved in a manner most consistent with the relevant terms of this policy without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the insured or us. In reaching any decision, the arbitrator(s) will give due consideration to the customs and usages of the insurance industry.

In the event of a judgement entered against us on an arbitration award. we will submit, at the Named Insured's request, to the jurisdiction of any court of competent jurisdiction within the United States, and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

Service of process in any suit against us must be mailed to: Claims Department, Zurich Insurance Company, 1400 American Lane, Schaumburg, Illinois 60196. In any suit instituted against us under this policy, we will abide by the final decision of such court of any appellate court in the event of an appeal.

5.  Other Insurance

If other valid and collectible insurance is available to an insured for a loss we cover under Coverage **A** or Coverage **B**, our obligations are limited as follows:

a.  Primary Insurance.

This insurance is primary except when Subsection (5)(b) applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by method described in Subsection(5)(c).

b.  Excess Insurance.

This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for an "insured's work";

(2) That is Fire insurance for premises rented to you; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **(g)** of Coverage **A** (Section **I**).

When this insurance is excess, we will have no duty under Coverage **A** or Coverage **B** to defend any "claim" or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all such other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not brought specifically to apply in excess of the Limits of Liability shown in the Declarations.

c.  Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of liability or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of liability to the total applicable limits of liability of all insurers.

**6.** Premium Audit

   **a.** All premiums for this policy will be based upon your payroll and will be computed in accordance with our rules and rates.

   **b.** We have the right to audit your payroll records at any time during the policy period but not more frequently than quarterly. You must send us copies of your payroll records at such times as we may request.

   **c.** Premium shown in Item 7 of the Declarations as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**7.** Representations

By accepting this policy, you agree that:

   **a.** The statements in the Declarations are accurate and complete;

   **b.** Those statements are based upon representations you made to us; and

   **c.** We have issued this policy in reliance upon your representations.

**8.** Separation of Insureds

Except with respect to the Limits of Liability and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

   **a.** As if each Named Insured were the only Named Insured; and

   **b.** Separately to each insured against whom "claim" is made or "suit" is brought.

**9.** Transfer of Rights of Recovery Against Others to Us

If an insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**10.** Changes

Notice to any agent or knowledge possessed by any agent or by any other person will not affect a waiver or a change in any part of this policy or prevent us from asserting any right under the terms of this policy.

The terms of this policy can be waived or changed only by endorsement issued by us to form part of this policy and signed by our authorized representative.

**11.** Assignment

Assignment of interest under this policy will not bind us until our consent is endorsed hereon.

**12.** Conforming with Statute

Any terms of this policy which are in conflict with the statutes of the state in which this policy is issued are hereby amended to conform with such statutes.

**13.** Severability

In the event that any provision of this policy is declared or deemed to be invalid or unenforceable under any applicable law, such invalidity or unenforceability will not affect the validity or enforceability of the remaining portion of this policy.

**Section V – Definitions**

**1.** "Advertising injury" means injury arising out of one or more of the following "offenses":

   **a.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **b.** Oral or written publication of material that violates a person's right of privacy;

   **c.** Misappropriation of advertising ideas or style of doing business; or

   **d.** Infringement of copyright, title or slogan;

committed in the course of advertising the goods, products or services of an insured.

**2.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But, "auto" does not include "mobile equipment."

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person as a result of an "occurrence," including death resulting from any of these at any time.

**4.** "Claim" means any demand against any insured for "damages" because of "bodily injury," "property damage," "personal injury" or "advertising injury." But "claim" does not include "suit."

**5.** "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions) and Canada;

   **b.** International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in Subsection (5)(a); or

   **c.** All parts of the world if;

     (1) The injury or damage arises out of:

U-SGP-110-A CW (10/95)
Page 8 of 12

    (a) Goods or products made or sold by you in the territory described in Subsection (5)(a); or

    (b) The activities of a person whose home is in the territory described in Subsection (5)(a), but is away for a short time on your business; and

  (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Subsection (5)(a) or in a settlement we agree to.

6. "Damages" means all sums that an insured becomes legally obligated to pay as a result of "claims" or "suits" either by adjudication or settlement, after making proper deductions for all recoveries and salvages collectible. "Damages" includes damages claimed by any person or organization for care, loss of services or death resulting at any time from "bodily injury." However, "damages" do not include (a) taxes, fines or penalties imposed by law, (b) matters which may be deemed uninsurable under the law pursuant to which this policy is construed or (c) "defense expenses."

7. "Defense expenses" means all payments that are directly attributable to specific "claims" or "suits" for the investigation, negotiation, settlement or defense of any "claim" or "suit" or in the investigation of any "occurrence" or "offense," including:

  a. All fees and expenses of attorneys we retain or an insured retains with our consent;

  b. All other fees and expenses we incur;

  c. Up to $250 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Coverage A applies. We do not have to furnish these bonds;

  d. The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Liability. We do not have to furnish these bonds;

  e. All reasonable expenses incurred by an insured at our request to assist us in the investigation or defense of any "claim" or "suit," including actual loss of earnings of up to $100 a day because of time off from work;

  f. All costs taxed against an insured in any "suit";

  g. Pre-judgement interest awarded against an insured on that part of the judgement we pay.

    If we make an offer to pay the applicable Limit of Liability, we will not pay any pre-judgement interest based on that period of time after the offer; and

  h. All interest on the full amount of any judgement that accrues after entry of the judgement and before we have paid, offered to pay or deposited in court the part of the judgement that is within the applicable Limit of Liability.

"Defense expenses" excludes all salaries of employees and office expenses of an insured.

8. a. "Impaired property" means tangible property, other than an "insured's product" or an "insured's work," that cannot be used or is less useful because:

  (1) It incorporates the "insured's product" or the "insured's work" that is known or thought to be defective, deficient, inadequate or dangerous; or

  (2) The insured has failed to fulfill the terms of a contract or agreement.

  b. Property is not "impaired property" if it can be restored to use by:

  (1) The repair, replacement, adjustment or removal of an "insured's product" or an "insured's work"; or

  (2) The insured's fulfilling the terms of the contract or agreement.

9. a. "Insured contract" means:

  (1) A lease of premises;

  (2) A sidetrack agreement;

  (3) An easement or license agreement in connection with vehicle or pedestrian private railroad crossings at grade;

  (4) Any other easement agreement, except in connection with construction or demolition operations on or within fifty (50) feet of a railroad;

  (5) An indemnification of a municipality as required by ordinance, except in connection with work for a municipality;

  (6) An elevator maintenance agreement; or

  (7) Subject to Subsection (9)(b)(4), that part of any other contract or agreement pertaining to an insured's business under which an insured assumes the tort liability of another to pay damages because of "bodily injury" or "property damage" to a person or organization, if the contract or agreement is made prior to the "bodily injury" or "property damage." Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

  b. "Insured contract" does not include that part of any contract or agreement:

  (1) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    a. Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

U-SGP-110-A CW (10/95)
Page 9 of 12

b. Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

(2) Under which an insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failing to render professional services, including those listed in Subsection 9(b)(1) and supervisory, inspection or engineering services;

(3) That indemnifies any person or organization for damage by fire to premises rented or loaned to an insured; or

(4) That indemnifies any person or organization against liability arising solely out of such person's or organization's errors or omissions.

10. "Insured's product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) An insured;

(2) Others trading under an insured's name; or

(3) A person or organization whose business or assets an insured has acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Insured's product" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Subsections 10(a) and (b).

"Insured's product" does not include vending machines or other property rented to or located for the use of others but not sold.

11. "Insured's work" means:

a. Work or operations performed by an insured or on an insured's behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Insured's work" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Subsection 11(a) and (b).

12. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

13. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises an insured owns or rents;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers.

e. Vehicles not described in Subsection 13(a), (b), (c) or (d) that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers.

f. Vehicles not described in Subsection 13(a), (b), (c) and (d) maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning.

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

U-SGP-110-A CW (10/95)
Page 10 of 12

14. "Occurrence" means an accident or continuous, intermittent or repeated exposure to conditions neither expected nor intended from the standpoint of an insured. All "bodily injury" and "property damage" that results directly or indirectly from the same or substantially the same accident or conditions will be treated as having arisen from one "occurrence," irrespective of the time period or the area over which the "bodily injury" and "property damage" occur, the number of such injuries and damages or the number of persons or organizations that sustain such injuries or damages.

15. "Offense" means only the offenses specified in Section V(16) and Section V(1), respectively. All "advertising injury" or "personal injury" arising from the same injurious material or act, regardless of the frequency or repetition thereof, the number or kind of media used or the number of claimants, will be treated as having arisen from one "offense."

16. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following "offenses":

    a. False or wrongful arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. Wrongful entry into, or eviction of a person from a room, dwelling or premises that the person occupies;

    d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    e. Oral or written publication of material that violates a person's right or privacy.

17. a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises an insured owns or rents and arising out of an "insured's product" or an "insured's work" except:

    (1) Products that are still in the insured's physical possession; or

    (2) Work that has not yet been completed or abandoned.

    b. An "insured's work" will be deemed completed at the earliest of the following times:

    (1) When all of the work called for in the insured's contract has been completed;

    (2) When all of the work to be done at the site has been completed if the insured's contract calls for work at more than one site; or

    (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    c. This hazard does not include "bodily injury" or "property damage" arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Products or operations for which the classification in this policy or in our manual of rules includes products or completed operations.

18. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property; or

    b. Loss of use of tangible property that is not physically injured.

19. "Security Guard Operations" means any security, patrol, protective, detective, investigatory, courier or examination services provided by an insured to a person or organization.

20. "Suit" means a civil proceeding in which "damages" because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such "damages" to which an insured must submit or submits with our consent. But "suit" does not include "claim".

IN WITNESS WHEREOF, the Company has caused this policy to be executive and attested, but this policy shall not be valid unless countersigned by a duly authorized representatative of the Company.

Constantine Iordanou
President
American Guarantee and Liability Insurance Company

Susan K. Harold
Secretary
American Guarantee and Liability Insurance Company

U-SGP-110-A CW (10/95)
Page 12 of 12

# Exhibit 3

Mr. Darren Stewart
Page 1
13-0203-1048
March 22, 2002


Q.   This is Jane McLaughlin.  I'm speaking with Darren
     Stewart.  Now, you are employed as a security guard?
A.   Yes.

Q.   By whom?  Who do you work for?
A.   Scruggs Security.

Q.   And you are assigned to where?
A.   Different posts throughout the day.

Q.   Okay, this interview is in regard to an incident that
     you were involved in at, this was at an apartment
     building at 741 Adams in Memphis, Tennessee?  Is that
     correct?
A.   That is correct.

Q.   And this happened on March 7, 2002?
A.   Yes.

Q.   Okay, what time of day?
A.   Approximately 12 o'clock.

Q.   Noon?
A.   Yes.

Q.   Okay, today's date is March 22nd of 2002, and before we
     start this, I just want to ask you if you do
     understand that we are recording this interview?
A.   Yes.

Q.   And we have your permission to record it?
A.   Yes.

Q.   Now, I need your full name, home address and phone
     number, please.
A.   Darren Lamont Stewart.  Phone number is 332-7581.
     Address is 750 East Raines, Apt. 4, 38106.

Q.   And your age, please?

Mr. Darren Stewart
Page 12
13-0203-1048
March 22, 2002

Q.   And exactly what did you say to him?
A.   Exactly?

Q.   As well as you can remember.
A.   I approached and I asked him please don't you know
     yell at me. I'm only asking you not to walk across
     the floor.

Q.   No, what's the first thing you said?
A.   When I told him not to walk across the floor.

Q.   Is that what you said, don't walk across the floor?
A.   I said, "sir, please don't walk across the floor
     she's waxing it".

Q.   And he said what?
A.   "Don't talk to me in that tone of voice, I'm grown and
     I can do what I want to do", something to that affect.

Q.   Then what?
A.   After that was over with . . .

Q.   Now, _____ the rest of this conversation?
A.   Yeah, I'm uh well he did walk you know away from
     where she was waxing and for the meanwhile, it was
     over with, now I'm getting to the point where he he
     kind of bumped into me later on, I think about fifteen
     minutes later, and I said "excuse me", but I
     disregarded it as like you know, passing somebody and
     making incidental contact. I noticed the second time
     he tried to pass and make contact with me again.

Q.   When you say "make contact", what do you mean?
A.   He tried to bump up against me and that's when I knew
     he was trying, he must've tried to do it the first
     time. Uh, I told him at that point, I said "well uh,
     you're looking for trouble, then fat meat is greasy,
     and you you gonna find trouble if that's what you're
     looking for.

Q.   What does that mean?
A.   Well, what that means, ma'am, is that I'm security on

Mr. Darren Stewart
Page 13
13-0203-1048
March 22, 2002

duty, and this guy is trying to push me around, and
he's, he's basically looking for trouble. So, either
I could write him up or either call MHA or somebody to
come out and talk with this man or something, but
shortly after that, he kind of laughed, laughed at
what I said and went upstairs. I paid it no mind and
I uh went to the restroom to wash up, I was expecting
lunch, and when I came, when I came back down, when I
came from the restroom, he was standing in the doorway
in between the two elevator doors with a rifle and I
knew then uh, we, we were going to have a problem, or
had a problem.

Q.   So the first encounter was at about 10:45, and that
     was about the floor?
A.   Um, hum.

Q.   Where was that, in the lobby?
A.   Yes, ma'am.

Q.   And he said he'd do whatever he wants?
A.   Yes.

Q.   And he did walk away?
A.   Yes.

Q.   Did he mention the floor again?
A.   Um, no.

Q.   You said he came back and bumped into you?
A.   Um, hum.

Q.   When was that?
A.   That was maybe fifteen minutes later.

Q.   And where were you then?
A.   I was right in front of the front door, the main
     entrance to the lobby.

Q.   And you didn't say anything about that?
A.   Not the first time.

# Exhibit 4

1    IN THE CIRCUIT COURT OF SHELBY COUNTY, TENNESSEE

2       FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

3

4    CHERYL BROWN GIGGERS, CHARLES
     C. BROWN, JR., ANGELA G. BROWN,
     INDIVIDUALLY AND AS THE SURVIVING
5    CHILDREN OF CHARLES CORNELIUS
     BROWN, SR., DECEASED, AND JOANN
6    FISHER, INDIVIDUALLY AND AS SURVIVING
     SISTER OF CHARLES CORNELIUS BROWN,
7    SR., DECEASED,

8           Plaintiffs,

9    VS.                         No.   CT-000896-03

10   MEMPHIS HOUSING AUTHORITY
     AND SCRUGGS SECURITY AND
11   PATROL, L.L.C.,

12          Defendants.

13
              DEPOSITION OF DARREN STEWART
14

15

16              April 18, 2006

17

18

19              COPY

20

21
            KELLY N. STEPHENS, RPR, CSR
22        22 North Second Street, Suite 303
            Memphis, Tennessee 38103
23               901-340-0866
            kstephens@midsouth.rr.com
24

37

1    A.        No.

2    Q.        Okay.  About what time of day was this?

3    A.        11:30 a.m.

4    Q.        Okay.  Do you remember what day of the

5    week it was?

6    A.        No.

7    Q.        Was it a weekday?

8    A.        Yes.

9    Q.        So this was during normal working

10   hours?

11   A.        Yes.

12   Q.        Okay.  So you see Mr. Miller and you

13   run back into the office?

14   A.        Correct.

15   Q.        Now, when you're on duty -- let me ask

16   you this, when you were on duty at this particular

17   location, where do you usually -- where are you

18   usually situated?  Is there a guard desk or

19   someplace like that?

20   A.        Yes.

21   Q.        Where is the guard desk?

22   A.        At the front door.

23   Q.        Okay.  You told me about this -- about

24   six feet from --

https://documents.shelbycountytn.gov/CHNCAppNet/PrintHandler.as...

# Exhibit 5



5909 SHELBY OAKS DRIVE • SUITE 146 • MEMPHIS, TENNESSEE 38134
• 901-382-5821 • FAX 901-382-5824
CLAIMS@TENCO.COM • WWW.TENCO.COM

July 24, 2002

Ms. Laura Cooper
Zurich Insurance Group
1400 American Lane
Tower 2, Floor 8
Schaumberg, IL 60196

RE:  Claim No:        **96-0203-1011**
     Policy No:       651-020120
     Insured:         Memphis Housing Authority
     Your Insured:    Scruggs Security & Patrol
     Your Claim No:   9240059516
     D/L:             3/7/02
     Claimant:        Charles Brown
     Our File No:     13-0203-1048

Dear Ms. Cooper:

This will follow-up our telephone conversation with you of
June 11, 2002, wherein we advised you that we are tendering
the above claim to your office requesting that you confirm
in writing that Zurich will be willing to hold harmless and
indemnify Memphis Housing Authority in the event that any
claim is brought on behalf of Charles Brown.

We also will appreciate your prompt response.

Sincerely,
TENCO SERVICES, INC.

Jane McLaughlin, A.I.C.
Memphis Office

JM/eaf

HOME OFFICE 3310 WEST END AVENUE • SUITE 485 • NASHVILLE, TENNESSEE 37203 • 800-821-1313

OHIO ☐ KENTUCKY ☐ GEORGIA ☐ TENNESSEE ☐



**TENCO SERVICES, INC.**
GENERAL ADJUSTERS AND SURVEYORS

5909 SHELBY OAKS DRIVE • SUITE 146 • MEMPHIS, TENNESSEE 38134
• 901-382-5821 • FAX 901-382-5824 •
CLAIMS@TENCO.COM • WWW.TENCO.COM

October 15, 2002

Ms. Laura Cooper
Zurich Insurance Group
1400 American Lane
Tower 2, Floor 8
Schaumburg, IL 60196

RE:   Claim No:        **96-0203-1011**
      Policy No:       651-020120
      Insured:         Memphis Housing Authority
      Your Insured:    Scruggs Security & Patrol
      Your Claim No:   9240059516
      D/L:             3/7/02
      Claimant:        Charles Brown
      Our File No:     13-0203-1048

Dear Ms. Cooper:

This will follow up our previous correspondence to you of
July 24, 2002 requesting that you confirm in writing that
Zurich will be willing to hold harmless and indemnify
Memphis Housing Authority in the event that any claim is
brought on behalf of Charles Brown for the above incident.

Again, we will appreciate your prompt response to this
request.

Sincerely,
TENCO SERVICES, INC.

Jane McLaughlin Jse

Jane McLaughlin, A.I.C.
Memphis Office

JM/sb

TOM MOSS, President                    JOE MOSS, Founder
◙ OHIO ◙ KENTUCKY ◙ GEORGIA ◙ TENNESSEE ◙

5/1/2014 1:43

# TENCO SERVICES, INC.
## GENERAL ADJUSTERS AND SURVEYORS

5909 Shelby Oaks Dr., #146, Memphis, TN 38134
Phone (901) 382-5821; Fax (901) 382-5824

## FAX COVER SHEET

**FROM:**

☐ Home Office (see top of page)

**OHIO**

☐ Cincinnati, OH
Day/Night: (859) 426-9100
Fax: (859) 426-9101

**KENTUCKY**

☐ Bowling Green, KY
Day/Night: (270) 842-3222
Fax: (270) 847-3205

☐ Louisville, KY
Day/Night: (502) 426-7866
WATS: (800) 257-2819
Fax: (502) 426-8073

☐ Pikeville, KY
Day/Night: (606) 432-9055
Fax: (606) 432-9106

☐ Somerset, KY
Day/Night: (606) 679-6199
Fax: (606) 679-7545

**GEORGIA**

☐ Atlanta, GA
Day/Night: (770) 518-1935
Fax: (770) 518-7817

**TENNESSEE**

☐ Chattanooga, TN
Day/Night: (423) 875-5522
WATS: (800) 228-3620
Fax: (423) 875-5535

☐ Cleveland, TN
Day/Night: (423) 472-3251

☐ Cookeville, TN
Day/Night: (931) 526-2246
Fax: (931) 528-6523

☐ Jackson, TN
Day/Night: (731) 668-4639
Fax: (731) 664-6960

☐ Kingsport, TN
Day/Night: (423) 246-2496
Fax: (423) 246-9612

☐ Knoxville, TN
Day/Night: (865) 588-0237
Fax: (865) 588-4163

☐ Memphis, TN
Day/Night: (901) 382-5821
Fax: (901) 382-5824

☐ Nashville, TN
Day/Night: (615) 292-0088
WATS: (800) 621-1313
Fax: (615) 292-0061

☐ Tullahoma, TN
Day/Night: (931) 455-4494

**DATE:** 11/11/02      **TIME:** 8:30a

**TO:** Laura Cooper _____ (Individual)

Zurich Ins Group _____ (Company)

847-413-5558 _____ (Fax Phone)

**FROM:** Anne Mc Laughlin

**RE:** 11# 9340059516

Number of Pages Including Cover Sheet: 2

**Remarks:** ☐ URGENT   ☐ For Your Review   ☒ Please Reply

**MESSAGE:**

attached is copy of letter to you of
10/15/02 - May we please have a
reply - thanks



# GLANKLER BROWN, PLLC
## ATTORNEYS AT LAW

**FILE COPY**

C. WESLEY FOWLER·
DIRECT DIAL: (901) 576-1778
E-MAIL: wfowler@glanklez.com

ONE COMMERCE SQUARE
SEVENTEENTH FLOOR
MEMPHIS, TENNESSEE 38103-2566
(901) 525-1322
FACSIMILE (901) 525-2389

EAST OFFICE
6000 POPLAR AVENUE
SUITE 100
MEMPHIS, TENNESSEE 38119-3978
(901) 685-1322
FACSIMILE (901) 761-2454

April 6, 2004

Ms. Laura Cooper
1400 American Lane, Tower 248
Schaumburg, Illinois 60196

Re: ***Cheryl Giggers, et al vs The Department of Housing and
Community Development, et al
Shelby County Circuit Court No. CT-000896-05
Our File No. 15878.35706***

Dear Ms. Cooper:

This correspondence is a formal demand for indemnity and defense of the above-referenced claim pursuant to the policy of insurance you provided to Scruggs Security and Patrol. I am also requesting a copy of the insurance policy maintained by Scruggs Security and Patrol and Zurich. As you may be aware, the contractual agreement between Memphis Housing Authority and Scruggs Security and Patrol requires that Memphis Housing Authority be named as an additional insured on the insurance policy maintained by Scruggs Security and Patrol (§ 8.2.2, § 8.2.3). The agreement also requires that Scruggs Security and Patrol indemnify and defend Memphis Housing Authority in the above-referenced claim (§ 8.9). By copy of this correspondence, I am requesting that you, on behalf of Zurich and Scruggs Security and Patrol, acknowledge your responsibility to indemnify and defend Memphis Housing Authority in the above-referenced claim. Please respond to this letter by April 15, 2004.

Very truly yours,

**GLANKLER BROWN, PLLC**

C. Wesley Fowler

CWF/dcc
Enclosure(s) as Stated

# Exhibit 6

Print Document

07/09/2009 11:04 FAX 9017480092          TEHCOSERVICESINC                    Ø 002/028

OCT. 12, 2001  12:44PM   Y & LAND                        NO. 896   P. 2/2

## ACORD. CERTIFICATE OF INSURANCE

10/12/01

CLAY & LAND INSURANCE, INC.
P.O. BOX 171336
MEMPHIS, TN 38187-1336

SCRUGG'S SECURITY & PATROL, L.L.C.
730 ADAMS STREET, SUITE 103
MEMPHIS, TN 38103

COMPANIES AFFORDING COVERAGE

COMPANY A   ZURICH INSURANCE GROUP

| TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE | POLICY EXPIRATION DATE | ALL LIMITS IN THOUSANDS | |
|---|---|---|---|---|---|
| A | GENERAL LIABILITY COMMERCIAL GENERAL LIABILITY | SDL3747442-00 | 07/16/01 | 07/16/02 | GENERAL AGGREGATE | $ 1,000. |
| | | | | | PRODUCTS-COMP/OP AGGREGATE | $ 1,000. |
| | | | | | PERSONAL & ADVERTISING INJURY | $ 1,000. |
| | | | | | EACH OCCURRENCE | $ 1,000. |
| | | | | | FIRE DAMAGE | $ 0. |
| | | | | | MEDICAL EXPENSE | $ 5. |

CERTIFICATE HOLDER

SCRUGG'S SECURITY & PATROL, L.L.C.
730 ADAMS STREET, SUITE 103
MEMPHIS, TN 38103

ACORD 25-S (3/93)

# Exhibit 7

# SHUTTLEWORTH WILLIAMS, PLLC

ATTORNEYS AT LAW
22 NORTH FRONT STREET, SUITE 850
P.O. BOX 3020
MEMPHIS, TENNESSEE 38173-0020
TELEPHONE: 901-526-7399
FACSIMILE: 901-526-5056

**VICKIE L. MOFFETT**
E-mail: vmoffett@shuttleworthwilliams.com

Direct Dial: (901) 328-8252

December 20, 2012

C. Wesley Fowler, Esq.
FOWLER LAW FIRM
25 Dr. M.L. King Jr. Avenue
Memphis, Tennessee 38103

RE:  *Cheryl Brown Giggers, Charles C. Brown, Jr., Angela G. Brown,*
     *Individually and as the Surviving Children of Charles Cornelius Brown, Sr.,*
     *Deceased, and Joann Fisher, Individually and as the Surviving Sister of*
     *Charles Cornelius Brown, Sr., Deceased v. Memphis Housing Authority*
     *and Scruggs Security and Patrol, LLC*
     Shelby County Circuit Court Docket No. CT-000896-03
     Our File Number:   V18680.295

Dear Wes:

Per your request, enclosed please find a copy of the insurance policy.

Very truly yours,

SHUTTLEWORTH WILLIAMS, PLLC

VICKIE L. MOFFETT

VLM/jsm
Enclosure

NASHVILLE:   230 4th Avenue North, Suite 500; Nashville, TN 37219; Telephone: 615-833-3390; Facsimile: 615-833-3767
KNOXVILLE:   800 South Gay Street, Suite 2031, Knoxville, TN 37929; Telephone: 865-622-7118; Facsimile: 865-622-7119

COMMERCIAL GENERAL LIABILITY AND
SECURITY GUARD ERRORS AND OMISSIONS POLICY
Declarations

AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY
New York, New York
Administrative Offices - 1400 American Lane
Schaumburg, Illinois 60196-1056

**ZURICH**

Policy Number EOL3747442-00

| Item 1. Named Insured and Address (Number, Street, Town or City, County, State, Zip Code) | Producer Name Victor O. Schimmeror & Company, Inc. |
|---|---|
| | Item 2. Location of all premises you own, rent or occupy (including zip code). |

Scruggs Security & Patrol
750 Adams Street
Suite 103
Memphis, TN 38103

Item 3. Policy Period:   From:   07/16/2001   To:   07/16/2002
12:01 A.M. Standard Time at the address shown in Item 1.

Item 4. Limits of Liability                                                Per Occurrence/Offense Limit

A. Coverage A: Bodily Injury and Property Damage Liability
B. Coverage B: Personal Injury and Advertising Injury Liability          
C. Coverage C: Medical Payments

Annual Aggregate Limit for all coverage listed above

Item 5. Deductible (applicable to damages, judgments, settlements, defense expenses and costs)

 per claim

Item 6. Form of Named Insured Business

Other (specify) _____

| Item 7. Premium Classification | Code Number | Premium Basis | Rate | Premium |
|---|---|---|---|---|
| Security & Patrol Agency | 98751 |  | | |

Item 8.   Forms and Endorsements attached at issue.

See Schedule of Forms and Endorsements attached

By acceptance of this policy the Insured agrees that the statements in the Declaration and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Remarks | Countersigned at | Authorized Representative | Date Countersigned |
|---|---|---|---|
| Ref.  002140  Chevy Chase, MD | | *James F. Willging* | 07/24/2001 |

U-SGP-D-111-A CW (10/95)

COMMERCIAL GENERAL LIABILITY AND
SECURITY GUARD ERRORS AND OMISSIONS POLICY
Declarations
    AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY
              1400 American Lane
         Schaumburg, IL  60196-1056

**ZURICH**

Policy Number EOL3747442-00

## Schedule of Forms and Endorsements

| Form | Description |
|------|-------------|
| U-SGP-110A CW (10/95) | COVERAGE DOCUMENT |
| U-SGP-D-111-A CW (10/95) | DECLARATIONS |
| U-SGP-113-A CW | CANINE EXCLUSION |
| U-SGP-115-A CW | ALARM EXCLUSION |
| U-SGP-116-A CW | NUCLEAR ENERGY LIABILITY |
| U-SGP-118-A CW | PERSONAL INJURY |
| U-SGP-119-A CW | ASSAULT AND BATTERY COVERAGE |
| U-SGP-117-A CW | LOST KEY COVERAGE |
| U-SGP-114-A CW | MODIFIED THEFT EXCLUSION |
| U-SGP-141-A TN | CANCELLATION & NONRENEWAL-TN |
| U-SGP-159-A TN | AMENDATORY ENDORSEMENT-TN |
| U-SGP-112-A CW | WAGE FREEZE ENDORSEMENT |

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01     Endorsement Number:        1

Canine Exclusion

**THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, Subsection 2. of Section I Coverages, Coverage A. **Bodily Injury And Property Damage Liability,** is amended by the addition of the following exclusion:

"Bodily injury" or "property damage" arising out of the ownership, rental, maintenance or use of dogs in connection with "security guard operations."

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGF-113-A CW
(10/95)
I002140-B040170

**Countersigned by Authorized Representative**

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01      Endorsement Number:      2

**Alarm Exclusion**

**THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, Subsection 2. of
Section I - Coverages, Coverage A. Bodily Injury And Property
Damage Liability, is amended by the addition of the following
exclusion:

   "Bodily injury" or "property damage"  arising out of  or
   contributed to by the ownership, maintenance, operation, use
   or  installation of any alarm, alarm device, alarm component
   or  alarm  system  in  connection  with  "security  guard
   operations."

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

V-SGP-115-A CW        ────────────────────────────
(10/95)               **Countersigned by Authorized Representative**
IOO2140-B040170

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00         Effective: 07/16/01   Endorsement Number:    3

Nuclear Energy Liability (Broad Form)

THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Commercial General Liability And Security Guard Errors And
Omissions Policy

In consideration of the premium charged, Subsection 2. of Section
I - Coverages, Coverage A. Bodily Injury And Property Damage
Liability  and  Subsection 2. of Section I Coverages, Coverage B.
Personal Injury And Advertising Injury Liability, are amended by
the addition of the following exclusion:

(1) Under any liability coverage, to "bodily injury"  or
"property damage:"

  (a) With respect to which an "insured" under the policy is
also an insured under a nuclear energy liability policy
issued  by  the  Nuclear  Energy  Liability  Insurance
Association,   Mutual   Atomic   Energy   Liability
Underwriters, Nuclear Insurance Association of Canada
or any of their successors, or would be an insured
under  any  such policy but for its termination upon
exhaustion of its limit of liability; or

  (b) Resulting from the "hazardous properties"  of  "nuclear
material"  and  with respect to which (i) any person or
organization  is  required  to  maintain  financial
protection  pursuant  to the Atomic Energy Act of 1954,
or any law amendatory thereof, or (ii) the insured is,
or  had  this policy not been issued would be, entitled
to indemnity from the United States of America, or  any
agency thereof, under any agreement entered into by the
United States  of America, or any agency thereof, with
any person or organization.

(2) Under any medical payments coverage, expenses incurred with
respect to  "bodily injury"  resulting from the "hazardous
properties"  of "nuclear material" and arising out of  the
operation  of  a  "nuclear facility"  by any person or
organization.

(3) Under any liability coverage, "bodily injury"  or  "property
damage"  resulting from the  "hazardous properties"  of
"nuclear material," if:

  (a) The "nuclear material" (i) is at any "nuclear facility"
owned by, or operated by or on behalf of, an insured or

PAGE  1

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00      Effective: 07/16/01      Endorsement Number:      3

(ii) has been discharged or dispersed therefrom;

(b) The "nuclear material" is contained in "spent fuel" or
"waste" at any time possessed, handled, used,
processed, stored, transported or disposed of by or on
behalf of an insured; or

(c) The "bodily injury" or "property damage" arises out of
the furnishing by an insured of services, materials,
parts or equipment in connection with the planning,
construction, maintenance, operation or use of any
"nuclear facility", but if such facility is located
within the United States of America, its territories or
possessions or Canada, this exclusion (3) applies only
to "property damage" to such a "nuclear facility" and
any property thereat.

(4) As used in this endorsement:

"Hazardous properties" include radioactive, toxic or
explosive properties;

"Nuclear material" means "source material," "special nuclear
material," or "by-product material;"

"Source material," "special nuclear material," and "by-
product material" have the meanings given them in the
Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid
or liquid, which has been used or exposed to radiation in a
"nuclear reactor;"

"Waste" means any waste material (a) containing "byproduct
material" other than the tailings or wastes produced by the
extraction or concentration of uranium or thorium from any
ore processed primarily for its "source material" content,
and (b) resulting from the operation by any person or
organization of any "nuclear facility" included under
paragraphs (a) and (b) of the definition of "nuclear
facility."

(5) "Nuclear facility" means:

(a) Any "nuclear reactor;"

(b) Any equipment or device designed or used for (i)
separating the isotopes of uranium or plutonium, (ii)
processing or utilizing "spent fuel," or (iii)
handling, processing or packaging "waste;"

(c) Any equipment or device used for the processing,

PAGE 2

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00        Effective: 07/16/01    Endorsement Number:    3

fabricating or alloying of "special nuclear material"
if at any time the total amount of such material in the
custody of the "insured" at the premises where such
equipment or device is located consists of or contains
more than 25 grams of plutonium or uranium 233 or any
combination thereof, or more than 250 grams of uranium
235;

(d) Any structure, basin, excavation, premises or place
prepared or used for the storage or disposal of
"waste;"

and includes the site on which any of the foregoing is
located, all operations conducted on such site and premises
used for such operations;

"Nuclear reactor" means any apparatus designed or used to
sustain nuclear fission in a self-supporting chain reaction
or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive
contamination of property.

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGP-116-A CW
(10/95)
1002140-B040170

Countersigned by Authorized Representative

PAGE 3

Zurich-American Insurance Group



**ZURICH**

INSURED: Scraggs Security & Patrol
Policy : BOL3747442-00          Effective: 07/16/01   Endorsement Number:   4

Amendatory Endorsement - Personal Injury

**THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, it is agreed that subparagraph a.(4) of paragraph 2., Exclusions, Coverage B. Personal Injury and Advertising Injury Liability, Section I, Coverage  is deleted in its entirety and replaced by the following:

    a.  "Personal injury" or "advertising injury:"

        (4)  For which an insured has assumed liability in a contract or agreement. Notwithstanding the foregoing, this exclusion does not apply to liability:

            a)  Assumed in a contract or agreement that is an "insured contract"; or

            b)  That an insured would have in the absence of the contract or agreement.

It is further agreed that Subsection 9. a. (7) of Section V - Definitions is deleted in its entirety and replaced by the following:

    9.a.  "Insured contract" means:

        (7)  Subject to Subsection 9 b.(4), that part of part of any other contract or agreement pertaining to an insured's business under which an insured assumes the tort liability of another to pay damages because of "bodily injury," "property damage" or "personal injury" to a person or organization, if the contract or agreement was made prior to the "bodily injury," "property damage" or "personal injury." Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

PAGE  1

Zurich-American Insurance Group

 **ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00    Effective: 07/16/01    Endorsement Number:    4

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-118-A CW
(10/95)                     Countersigned by Authorized Representative
I002140-B040170

PAGE  2

**Zurich-American Insurance Group**



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01    Endorsement Number:    5

Assault and Battery Coverage

THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

The following replaces paragraph a. of **Section I., Part 2., Exclusions:**

a.    "Bodily injury" or "property damage"    expected or intended from the standpoint of an insured. This exclusion does not apply to:

    (1)   "Bodily injury" or "property damage" resulting from the use of physical force to protect persons or property.

    (2)   Alleged or actual negligent hiring, improper training or inadequate supervision by a person or organization who acts as the employer of a security guard insured under this policy, when such security guard's acts result in "bodily injury" or "property damage."

All other terms and conditions of this policy remain unchanged.

U-SGP-119-A CW
(12/95)
I002140-B040170

*Jame F. Willging*

Countersigned by Authorized Representative

Zurich-American Insurance Group

 **ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00        Effective: 07/16/01    Endorsement Number:    6

Amendatory Endorsement - Lost Key Coverage

THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, it is agreed that subparagraph (d) is added to Subsection 1. Insuring Agreement of the provision entitled Coverage A - Bodily Injury and Property Damage Liability of Section 1. Coverages.

d.  We will pay, subject to provisions a, b and c above, those sums that the insured becomes legally obligated to pay as "damages" because of "property damage" resulting from the loss of keys in the possession of the insured or of his employees. Notwithstanding the foregoing, this coverage shall not apply to "property damage" caused by any misappropriation, secretion, conversion, infidelity or any dishonest act on the part of any insured, or any employee or agent of any insured. Liability for "property damage" due to lost keys is furthermore limited to the actual cost of keys, adjustment of locks to accept new keys or new locks, if required, including their installation.

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGP-117-A CW
(10/95)        _____
I002140-B040170        Countersigned by Authorized Representative

Zurich-American Insurance Group    

**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00        Effective: 07/16/01    Endorsement Number:    7

Modified Theft Exclusion

THIS ENDORSEMENT AMENDS THE POLICY — PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Commercial General Liability And Security Guard Errors And
Omissions Policy

In consideration of the premium charged, Exclusion (c) of
Subsection 2. of Section I – Coverages, Coverage A. Bodily
Injury And Property Damage Liability, is deleted in its entirety,
and Definition (18), "Property Damage," in Section V –
Definitions, is amended by the addition of the following
provision:

    c.  Theft or loss of property. However, "property damage"
    does not mean:

        (1)  Theft by an insured or any employee of an insured;

        (2)  Theft or loss of money, securities or other
        valuables of others, while being transported by an
        insured or held on an insured's premises;

        (3)  Loss or that part of any loss of inventory, the
        proof of which, either as to its factual existence
        or as to its amount, depends upon (a) an inventory
        computation or actual physical count, (b) a
        comparison of inventory records with any actual
        physical count of inventory or (c) a profit and
        loss computation to establish the amount of any
        loss; or

        (4)  Any liability for "damages" or "defense expenses"
        arising from theft or loss of property assumed by
        an insured in a contract or agreement that is an
        "insured contract," unless such liability would be
        covered hereunder in the absence of such contract
        or agreement.

All other terms and conditions of this policy remain unchanged.

*James F. Willging*

U-SGP-114-A CW
(10/95)                _____
I002140-B040170        Countersigned by Authorized Representative

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00        Effective: 07/16/01   Endorsement Number:    8

Cancellation and Nonrenewal – Tennessee

**THIS ENDORSEMENT AMENDS THE POLICY – PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, it is agreed that Section IV, subsection 3. Cancellation is deleted in its entirety and replaced by the following:

**Cancellation**

1. This policy may be canceled by you by surrender thereof to us or by mailing to us written notice stating when thereafter such cancellation shall be effective. If canceled by you, we shall retain the customary short rate proportion of the premium.

2. If this policy has been in effect for fewer than sixty (60) days and is not a renewal, we may cancel this policy by mailing or delivering to you, at the address shown in the policy, written notice of cancellation at least ten (10) days before the effective date of cancellation.

3. If this policy has been in effect for sixty (60) days or more, or is a renewal, we may not cancel this policy except for any one of the following reasons:

    (a) Nonpayment of premium, including nonpayment of any additional premiums, calculated in accordance with the current rating manual of the Company, justified by a physical change in the insured property or a change in its occupancy or use;

    (b) Conviction of the Named Insured of a crime having as one of its necessary elements an act increasing any hazard insured against;

    (c) Discovery of fraud or material misrepresentation on the part of either of the following:

        (1) The insured or his representative in obtaining the policy; or

        (2) The Named Insured in pursuing a claim under the policy:

PAGE 1

Zurich-American Insurance Group                          
                                                         **ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00      Effective: 07/16/01   Endorsement Number:   8

    (d) Failure to comply with written loss control recommendations;

    (e) Material change in the risk which increases the risk of loss after the policy has been issued or renewed;

    (f) Determination by the Commissioner that the continuation of the policy would jeopardize the Company's the policy would jeopardize the Company's solvency or would place the Company in violation of the insurance laws of this state or any other state;

    (g) Violation or breach by the insured of any policy terms or conditions; or

    (h) Such other reasons that are approved by the Commissioner.

4. If we cancel this policy in accordance with paragraph 3. above, cancellation may be effected by mailing or delivering to you, at the address shown in the policy, written notice of cancellation at least ten (10) days before the effective date of cancellation.

5. If we cancel this policy for any reason set forth in paragraph c. above, we will identify the reason for cancellation in the cancellation notice.

6. If we cancel this policy, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

7. The mailing of any notice pursuant to this provision shall be sufficient proof of notice. Delivery of such written notice shall be the equivalent of mailing.

**Nonrenewal**

1. If we decide not to renew this policy, we shall deliver or mail written notice at least sixty (60) days before the policy expiration date to you at the address shown in the policy.

2. Notice of nonrenewal is not required if you have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

PAGE 2

Zurich-American Insurance Group

 **ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00        Effective: 07/16/01   Endorsement Number:    8

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-141-A TN
(12/95)
I002140-B040170        Countersigned by Authorized Representative

PAGE 3

Zurich-American Insurance Group



**ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01    Endorsement Number:    9

Amendatory Endorsement - Tennessee

**THIS ENDORSEMENT AMENDS THE POLICY - PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, it is agreed that Section V - Definitions, subsection 6. "Damages" is deleted in its entirety and replaced by the following.

6. "Damages" means all sums that an insured becomes legally obligated to pay as a result of "claims" or "suits" either by adjudication or settlement, after making proper deductions for all recoveries and salvages collectible. "Damages" includes damages claimed by any . person or organization for care, loss of services or death resulting from "bodily injury." However, "damages" do not include taxes, fines, penalties or matters which may be deemed uninsurable under the law pursuant to which this policy is construed or "defense expenses."

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-159-A TN          _____
(1/96)                  Countersigned by Authorized Representative
I002140-B040170

Zurich-American Insurance Group

 **ZURICH**

INSURED: Scruggs Security & Patrol
Policy : EOL3747442-00          Effective: 07/16/01    Endorsement Number:    10

Wage Freeze Endorsement

**THIS ENDORSEMENT AMENDS THE POLICY — PLEASE READ IT CAREFULLY**

This endorsement modifies insurance provided under the following:

**Commercial General Liability And Security Guard Errors And Omissions Policy**

In consideration of the premium charged, and notwithstanding Condition 6., Premium Audit, of Section IV — Commercial General Liability And Security Guard Errors And Omissions Conditions, if you maintain adequate payroll records demonstrating that the maximum hourly wages you pay exceed $4.50, then the amount of hourly wages that we will use to compute your audit premiums for the period 07/16/2001 to 07/16/2002 will not exceed this maximum amount for such period.

All other terms and conditions of this policy remain unchanged.

*James F. Wilging*

U-SGP-112-A CW
(10/95)
I002140-B040170                   Countersigned by Authorized Representative

# Exhibit 8



**Charles Fowler <wfowler@wesfowlerlaw.com>**

## Brown v. MHA / Scruggs
9 messages

**Charles Fowler** <wfowler@wesfowlerlaw.com>                Fri, Mar 1, 2013 at 4:20
                                                                                PM
To: Vickie Moffett <VMoffett@shuttleworthwilliams.com>
Bcc: Ben Griffith <bgriff@griffithlaw.net>

Vicki, it was nice talking to you today. This confirms my request that your client
produce the entire liability insurance policy issued by Zurich and in effect at the time
of the subject incident. This should include the actual coverage form, the declaration
page, any additional insured endorsement, any exclusion for breach of contract and
any exceptions to such exclusion, any coverage provision for contractual
indemnification agreements which are part of an insured contract, and a complete
forms list.

That's a mouthful. Let me know if Scruggs will agree to produce this informally,
without the need for a request / motion to compel.

Take care,

Wes

C. Wesley Fowler, Esq.
The Fowler Law Firm, PLLC
25 Dr. M L K Jr Avenue
Memphis, Tennessee 38103
Office (901) 322-8018
Fax (800) 322-3161
wfowler@wesfowlerlaw.com
www.wesfowlerlaw.com

**Vickie Moffett** <VMoffett@shuttleworthwilliams.com>        Fri, Mar 1, 2013 at
                                                                                4:50 PM
To: Charles Fowler <wfowler@wesfowlerlaw.com>

Sorry Wes. The company sent the attached after I sent you the first set of policy

documents and they never got sent to you. Let me know what questions remain after reviewing this. I believe the dec page and forms list were part of the original set of documents. Let me know if I am mistaken.

**From:** Charles Fowler [mailto:wfowler@wesfowlerlaw.com]
**Sent:** Friday, March 01, 2013 4:21 PM
**To:** Vickie Moffett
**Subject:** Brown v. MHA / Scruggs

[Quoted text hidden]

📧 **110acw.doc**
94K

# Exhibit 9

| File No. | Invoice # | Invoice Date | Amount |
|----------|-----------|--------------|--------|
| 1302031048 | 13116507 | 01/26/2005 | 358.69 |
| 1302031048 | 13119191 | 02/27/2007 | 354.49 |
| 1302031048 | 13120256 | 02/29/2008 | 358.71 |
| 1302031048 | 13113585 | 03/12/2003 | 245.26 |
| 1302031048 | 13118223 | 05/03/2006 | 404.63 |
| 1302031048 | 13115695 | 05/21/2004 | 257.22 |
| 1302031048 | 13114036 | 06/23/2003 | 545.13 |
| 1302031048 | 13112295 | 06/26/2002 | 1,448.95 |
| 1302031048 | 13121352 | 07/30/2009 | 474.28 |
| 1302031048 | 13116058 | 09/13/2004 | 323.54 |
| 1302031048 | 13117517 | 11/09/2005 | 339.47 |
| 1302031048 | 13113042 | 11/12/2002 | 220.53 |
| 1302031048 | 13121070 | 11/18/2008 | 472.61 |
| 1302031048 | 13115042 | 11/25/2003 | 207.27 |
| 1309111008 | 130900770 | 12/28/2009 | 242.10 |
| 1309111008 | 131000440 | 06/30/2010 | 406.88 |
| 1309111008 | 131000610 | 09/07/2010 | 331.07 |
| 1309111008 | 131000810 | 11/30/2010 | 422.55 |
| 1309111008 | 131100298 | 04/26/2011 | 495.34 |
| 1309111008 | 131100648 | 08/02/2011 | 566.67 |
| 1309111008 | 131100971 | 11/29/2011 | 427.19 |
| 1309111008 | 131200433 | 07/09/2012 | 707.57 |
| 1309111008 | 131300117 | 02/28/2013 | 549.60 |
| | | | |
| | Total | | 10,159.73 |

5/1/2014 1:43 PM

## TENNESSEE HOUSING AUTHORITY
### Checking Account Register - 4/11/2013

| ITEM # | DATE | DEPOSIT | CHECK # | CLAIM # | CHECK AMOUNT | PAYEE | YEAR / LOSS |
|--------|------|---------|---------|---------|--------------|-------|-------------|
| 881 | 11/28/03 | | 1723 | 96-0203-1011 | $ 1,252.77 | Glankler Brown, atty | 2002 |
| 961 | 06/10/04 | | 1791 | 96-0203-1011 | $ 896.40 | Glankler Brown, atty | 2002 |
| 1019 | 11/03/04 | | 1844 | 96-0203-1011 | $ 3,411.17 | Gary K. Smith, atty | 2002 |
| 1061 | 01/12/05 | | 1883 | 96-0203-1011 | $ 1,069.24 | Gary K. Smith, atty | 2002 |
| 2013 | 05/11/05 | | 1920 | 96-0203-1011 | $ 1,719.16 | Gary K. Smith, atty. | 2002 |
| 2117 | 10/11/05 | | 2013 | 96-0203-1011 | $ 1,227.04 | Gary K. Smith, atty | 2002 |
| 2188 | 02/21/06 | | 2066 | 96-0203-1011 | $ 1,714.81 | Gary K. Smith, atty | 2002 |
| 2209 | 03/23/06 | | 2086 | 96-0203-1011 | $ 1,107.54 | Gary K. Smith, atty | 2002 |
| 2299 | 10/11/06 | | 2168 | 96-0203-1011 | $ 1,630.70 | Gary K. Smith, atty | 2002 |
| 2365 | 02/05/07 | | 2215 | 96-0203-1011 | $ 4,405.09 | Gary K. Smith, atty | 2002 |
| 2506 | 12/20/07 | | 2340 | 96-0203-1011 | $ 3,826.07 | Gary K. Smith, atty | 2002 |
| 2487 | 05/23/08 | | 2400 | 96-0203-1011 | $ 1,492.46 | Gary K. Smith, atty. | 2002 |
| 2537 | 09/05/08 | | 2446 | 96-0203-1011 | $ 3,401.66 | Gary K. Smith, atty. | 2002 |
| 2538 | 11/13/08 | | 2470 | 96-0203-1011 | $ 7,659.68 | Wesley Fowler, atty | 2002 |
| 2284 | 04/01/09 | | 2526 | 96-0203-1011 | $ 846.30 | Wesley Fowler, atty | 2002 |
| 2231 | 06/03/09 | | 2541 | 96-0203-1011 | $ 1,531.00 | Appellate Court Clerk | 2002 |
| 2301 | 10/14/09 | | 2602 | 96-0203-1011 | $ 9,792.31 | C. Wesley Fowler, atty | 2002 |
| 2359 | 01/07/10 | | 2642 | 96-0203-1011 | $ 16,799.94 | C. Wesley Fowler, atty | 2002 |
| 2417 | 05/27/10 | | 2693 | 96-0203-1011 | $ 6,785.68 | C. Wesley Fowler, atty | 2002 |
| 2475 | 09/17/10 | | 2745 | 96-0203-1011 | $ 4,966.78 | C. Wesley Fowler, atty | 2002 |
| 2625 | 07/12/11 | | 2870 | 96-0203-1011 | $ 13,632.00 | C. Wesley Fowler, atty | 2002 |
| 2749 | 02/23/12 | | 2972 | 96-0203-1011 | $ 7,022.30 | C. Wesley Fowler, atty | 2002 |
| | | | Total | | $ 96,190.10 | | |

Page 1 of 1



**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

BHY / ALL
Transmittal Number: 12506108
Date Processed: 05/09/2014

| | |
|---|---|
| **Primary Contact:** | Nancy Murray<br>Zurich North America<br>1400 American Lane<br>Tower One<br>Schaumburg, IL 60196-1056 |

| | |
|---|---|
| **Entity:** | American Guarantee and Liability Insurance Company<br>Entity ID Number 2746713 |
| **Entity Served:** | American Guarantee & Liability Ins Co |
| **Title of Action:** | Memphis Housing Authority vs. Zurich American Insurance Group, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Thirtieth Judicial District at Memphis, Tennessee |
| **Case/Reference No:** | CH-14-0313 |
| **Jurisdiction Served:** | Tennessee |
| **Date Served on CSC:** | 05/08/2014 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | TN - Dept. of Commerce and Insurance on 05/02/2014 |
| **How Served:** | Certified Mail |
| **Sender Information:** | Charles Wesley Fowler<br>901-332-8018 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

**STATE OF TENNESSEE**
**Department of Commerce and Insurance**
**500 James Robertson Parkway**
**Nashville, TN 37243-1131**
**PH - 615.532.5260, FX - 615.532.2788**
**Jerald.E.Gilbert@tn.gov**

May 2, 2014

American Guarantee & Liability Ins Co
2908 Poston Avenue, % C S C
Nashville, TN  37203
NAIC # 26247

Certified Mail
Return Receipt Requested
7012 3460 0002 8943 1291
Cashier # 15365

Re:     Memphis Housing Authority  V.  American Guarantee & Liability Ins Co

        Docket # CH-14-0313

To Whom It May Concern:

Pursuant to Tennessee Code Annotated § 56-2-504 or § 56-2-506, the Department of
Commerce and Insurance was served May 2, 2014, on your behalf in connection with the
above-styled proceeding.  Documentation relating to the subject is herein enclosed.

Jerald E. Gilbert
Designated Agent
Service of Process

Enclosures

cc: Chancery Court Clerk
    Shelby County
    140 Adams Street, Rm 308
    Memphis, Tn  38103

**(CIRCUIT/CHANCERY) COURT OF TENNESSEE**
**140 ADAMS AVENUE, MEMPHIS, TENNESSEE 38103**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

ELECTRONICALLY FILED
2014 Feb 28 PM 2:50
CLERK OF COURT - CHANCERY

## SUMMONS IN CIVIL ACTION

Docket No. _____

○ Lawsuit
○ Divorce

Ad Damnum $ _____

| MEMPHIS HOUSING AUTHORITY | VS | ZURICH AMERICAN INSURANCE GROUP, INC. AND AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, INC. |
|---|---|---|

Plaintiff(s)                                                  Defendant(s)

TO: (Name and Address of Defendant (One defendant per summons))

| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, INC. SERVE THROUGH THE COMMISSION OF INSURANCE 500 JAMES ROBERTSON PARKWAY NASHVILLE, TN 37243 | Method of Service: ○ Certified Mail ○ Shelby County Sheriff ⊘ Commissioner of Insurance ($) ○ Secretary of State ($) ○ Other TN County Sheriff ($) ○ Private Process Server ○ Other |
|---|---|

($) Attach Required Fees

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and serving a copy of your answer to the Complaint on  CHARLES WESLEY FOWLER                                  Plaintiff's
attorney, whose address is  25 DR. M L KING JR. AVENUE, MEMPHIS, TN 38103            , telephone    +1 (901) 322-8018
within THIRTY (30) DAYS after this summons has been served upon you, not including the day of service. If you fail to do so, a
judgment by default may be taken against you for the relief demanded in the Complaint.

JIMMY MOORE, Clerk / DONNA RUSSELL, Clerk and Master

TESTED AND ISSUED _____                       By _____ , D.C.

### TO THE DEFENDANT:

NOTICE: Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice:
Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment
should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish
to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless
it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain
items are automatically exempt by law and do not need to be listed. These include items of necessary wearing apparel (clothing) for yourself and
your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of
these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish
to seek the counsel of a lawyer.

FOR AMERICANS WITH DISABILITIES ACT (ADA) ASSISTANCE ONLY, CALL (901) 222-2341

I, JIMMY MOORE / DONNA RUSSELL ,  Clerk of the Court,
Shelby County, Tennessee, certify this to be a true and
accurate copy as filed this

_____

JIMMY MOORE , Clerk / DONNA RUSSELL, Clerk and Master

By: _____ , D.C.

## RETURN OF SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I HAVE SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20_____ at _____ M. a copy of the summons

and a copy of the Complaint to the following Defendant _____

at _____

By: _____
Sheriff or other authorized person to serve process

_____
Signature of person accepting service

## RETURN OF NON-SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I HAVE NOT SERVED THE WITHIN SUMMONS:

To the named Defendant _____

because _____ is (are) not to be found in this County after diligent search and inquiry for the following

reason(s): _____

This _____ day of _____, 20_____.

By: _____
Sheriff or other authorized person to serve process



The Shelby County, Tennessee Chancery Court

**Case Style:**       MHA V ZURICH AMERICAN INSURANCE GROUP ET AL

**Case Number:**     CH-14-0313

**Type:**           Process issued other (T)

*Paul Bry*

Paul Bryant, DC

Electronically signed on 02/28/2014 03:06:31 PM

ELECTRONICALLY FILED
2014 Feb 28 PM 2:50
CLERK OF COURT - CHANCERY

(CIRCUIT/CHANCERY) COURT OF TENNESSEE
140 ADAMS AVENUE, MEMPHIS, TENNESSEE 38103
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

## SUMMONS IN CIVIL ACTION

Docket No. _____

◯ Lawsuit
◯ Divorce

Ad Damnum $ _____

MEMPHIS HOUSING AUTHORITY

VS

ZURICH AMERICAN INSURANCE GROUP, INC. AND AMERICAN
GUARANTEE AND LIABILITY INSURANCE COMPANY, INC,

| Plaintiff(s) | Defendant(s) |

TO: (Name and Address of Defendant (One defendant per summons))

ZURICH AMERICAN INSURANCE GROUP, INC.
SERVE THROUGH THE COMMISSION OF INSURANCE
500 JAMES ROBERTSON PARKWAY
NASHVILLE, TN 37243

**Method of Service:**

◯ Certified Mail
◯ Shelby County Sheriff
⊘ Commissioner of Insurance ($)
◯ Secretary of State ($)
◯ Other TN County Sheriff ($)
◯ Private Process Server
◯ Other

($) Attach Required Fees

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and
serving a copy of your answer to the Complaint on  CHARLES WESLEY FOWLER   Plaintiff's
attorney, whose address is  25 DR. M L KING JR. AVENUE, MEMPHIS, TN 38103  , telephone    +1 (901) 322-8018
within THIRTY (30) DAYS after this summons has been served upon you, not including the day of service. If you fail to do so, a
judgment by default may be taken against you for the relief demanded in the Complaint.

JIMMY MOORE, Clerk / DONNA RUSSELL, Clerk and Master

TESTED AND ISSUED _____     By _____, D.C.

TO THE DEFENDANT:

NOTICE; Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice:
Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment
should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish
to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless
it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain
items are automatically exempt by law and do not need to be listed. These include items of necessary wearing apparel (clothing) for yourself and
your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of
these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish
to seek the counsel of a lawyer.

FOR AMERICANS WITH DISABILITIES ACT (ADA) ASSISTANCE ONLY, CALL (901) 222-2341

I,  JIMMY MOORE / DONNA RUSSELL ,  Clerk of the Court,
Shelby County, Tennessee, certify this to be a true and
accurate copy as filed this

_____

JIMMY MOORE , Clerk /  DONNA RUSSELL, Clerk and Master

By: _____, D.C.

RETURN OF SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I **HAVE** SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20_____ at _____ M. a copy of the summons

and a copy of the Complaint to the following Defendant _____

at _____

_____          By: _____

Signature of person accepting service                                                Sheriff or other authorized person to serve process

---

RETURN OF NON-SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I **HAVE NOT** SERVED THE WITHIN SUMMONS:

To the named Defendant _____

because _____ is (are) not to be found in this County after diligent search and inquiry for the following

reason(s): _____

This _____ day of _____, 20_____.

By: _____

Sheriff or other authorized person to serve process



**The Shelby County, Tennessee Chancery Court**

**Case Style:**     MHA V ZURICH AMERICAN INSURANCE GROUP ET AL

**Case Number:**   CH-14-0313

**Type:**           Process issued other (T)

*Paul Bryant*

Paul Bryant, DC

Electronically signed on 02/28/2014 03:06:31 PM